David Frank SPANBAUER, Petitioner-Appellant,

v.

John C. BURKE, Warden, Wisconsin State Prison, Respondent-Appellee.

No. 15645.

United States Court of Appeals Seventh Circuit.

Dec. 28, 1966.

Kiley, Circuit Judge, dissented.

L. C. Hammond, Jr., Milwaukee, Wis., for appellant.

Bronson C. La Follette, Atty. Gen., William A. Platz, Asst. Atty. Gen., Madison, Wis., for appellee.

Before HASTINGS, Chief Judge, and KNOCH and KILEY, Circuit Judges.

HASTINGS, Chief Judge.

David Frank Spanbauer has appealed from an order of the district court, entered after a full evidentiary hearing, denying his petition for a writ of habeas corpus.

On February 29, 1960, Spanbauer, who waived counsel at his arraignment and later at time of trial, was convicted in a Wisconsin state court following his pleas of guilty to ten separate counts of an information charging him with armed robbery (two counts), rape, conduct regardless of human life, burglary, theft, attempted rape and armed burglary (three counts), all committed within a period of three to five weeks.

While Spanbauer pleaded guilty, a hearing was held, witnesses appeared, testimony was taken and copies of statements and confessions by Spanbauer to the police were admitted into evidence. At the end of the hearing, Spanbauer indicated that the testimony taken was a true and correct account of the various crimes contained in the information.

Spanbauer was sentenced to an aggregate of 70 years imprisonment for all but the sex crimes. Sentencing on the sex crimes was postponed until the Wisconsin State Department of Public Welfare, in whose custody Spanbauer was placed for examination, reported whether he was a fit subject for commitment for treatment at the Wisconsin sex deviate facility pursuant to sec. 959.15, Wis. Stats. On May 3, 1960, following that report, Spanbauer was committed to the sex deviate facility for treatment.

On appeal, it is argued that Spanbauer's waiver of counsel was ineffectual because the trial court failed to advise him of the possibility of appointed counsel, of the range of allowable punishments and of possible defenses and mitigating circumstances. It is also urged

that Spanbauer was deprived of his right to counsel at the time of sentencing, when Spanbauer gave some indication to a prosecuting attorney that he desired counsel.

On February 15, 1960, Spanbauer was taken into police custody in Sheboygan, Wisconsin on charges of carrying a concealed weapon and petty larceny. Spanbauer admitted committing a burglary in Wauwatosa, Wisconsin, and two police officers from that city took custody of Spanbauer on February 18 and returned him to Wauwatosa.

These detectives testified that they advised Spanbauer of his right not to talk and of his right to an attorney, either retained or appointed.

On February 19, Spanbauer was questioned by police officers. He was questioned again the following day after bond had been set. In the afternoon of February 20, after having been moved to the Milwaukee County Jail, he gave a voluntary statement confessing crimes of which he had not been suspected. On February 21, he was questioned again by other officers, and gave two further statements.

Brown County district attorney Grant, the prosecuting attorney, testified he had a conversation with Spanbauer in his cell on February 24, 1960, that he explained to him procedures relating to arraignment and preliminary hearing; the right of counsel, including appointment of counsel; the plea of not guilty; and at least some of the charges. Grant further indicated to Spanbauer that he was likely to get a "good jolt" or sentence, although he apparently did not indicate the penalties for specific offenses.

On February 24, Spanbauer waived preliminary examination and appointment of counsel before the municipal judge as magistrate at Green Bay, and pleaded guilty to three counts of the information. The colloquy relating to appointment of counsel is set out in the margin.[1]

1. "Now, Mr. Spanbauer, the Court has certain duties imposed upon it by law, and at this time the Court would like to discharge those duties. First of all, it is the duty of the Court to advise you that in each of the three counts contained in the complaint you are accused of committing the crime known as a felony. A felony is a crime which is punishable by imprisonment in the State Prison. Therefore, in each of the three counts, if you are convicted, you will be convicted of a felony and each of the three counts is subject to a term of imprisonment. Do you understand, Mr. Spanbauer—

"A. Yes, I do.

—that all of these counts are felonies? And do you understand that on each count you would be subject, if convicted, to a term of imprisonment?

"A. Yes, sir.

"Now, the second duty imposed by law upon the Court is that you must be advised at this point that you are entitled to be represented by an attorney if you wish. That is because you are accused of committing a felony. You have the privilege of being represented by a lawyer. If you would like to have a lawyer, a reasonable period of time will be allowed by the Court to make the necessary arrangements. On the other hand, if you feel that you do not want a lawyer in this case you can forego your privilege and give up your right to have an attorney. Is that clear to you, Mr. Spanbauer?

"A. Yes, sir.

"Q. And what would you decide in this case? Do you want a lawyer, or do you prefer to go through the entire proceedings without a lawyer?

"A. Without a lawyer.

"Q. You said without a lawyer? In other words, you do not want a lawyer in this case?

"A. (The defendant responds by nodding his head in the affirmative.)

"Now, Mr. Spanbauer, in view of the fact that you have said that you do not want a lawyer it is necessary that the Court ask you a few additional questions in order to determine that that is an intelligent decision on your part. Therefore, you are now asked by the Court first of all: What is the extent of your education? How far did you go in school?

"A. Junior grade in high school.

"Q. In other words, you were in the third year of high school?

"A. That's right.

"Q. Did you complete the third year?

"A. No, I didn't.

"Q. Did you complete the sophomore year of high school?

"A. Yes, I did.

Thereafter, the various charges against Spanbauer were consolidated for trial in one place, the crimes having occurred in different counties. On February 29, in the Municipal Court for Brown County, Spanbauer waived preliminary examination on seven additional counts of the information, pleaded guilty to each of the ten counts and waived counsel on the seven additional counts. After a hearing, Spanbauer was convicted and sentenced on eight counts.

On May 3, when Spanbauer was returned to court for sentencing following the evaluation under the sex deviate law, Spanbauer informed Grant that he desired counsel to represent him. Although there is conflict in the evidence in the record, it appears that this request was not transmitted to the judge, but that Spanbauer was told to make the request to the judge himself, which he did not do.

Spanbauer's petition for a writ of habeas corpus to the Wisconsin Supreme Court was denied without opinion on September 11, 1964.

Following a habeas corpus hearing, the federal district court found that there had been explained to Spanbauer the detailed procedures relating to appointment of counsel and the fact that counsel would be appointed for him if he were indigent.

The record discloses that as a young adolescent, Spanbauer was arrested four times for purse snatching, burglary, disorderly conduct and window peeping. Entering the Navy at age 17, he was given a bad conduct discharge for repeated AWOL. Psychiatric treatment was recommended. Shortly after his discharge from the Navy, he committed the criminal acts for which he was convicted.

Spanbauer's mental examination reports disclosed that he was socially deviant in a fashion for which mental treatment was deemed appropriate. He was described as "sociopathic", "very disturbed", "extremely dangerous" and characterized as being impulsive, having poor judgment, being severely withdrawn and having a great potential for "an acute psychotic reaction." By and large, his thinking and intelligence were not found to be impaired. Without further detailing the impressions and findings in the reports, it is sufficient to state that they are of such a nature as to raise the question of Spanbauer's general competency.

Although the federal district court did not discuss in detail the question of Spanbauer's competency with respect to his waiver of counsel, it found his mental capacity and emotional state were not so impaired as to render his waiver of counsel invalid.

Although the record is not completely clear as to exactly what Spanbauer was told prior to his trial, for purposes of appeal, we shall assume that he was not

"Q. And part of the junior year?
"A. Yes, sir.
"Q. And was that at the Oshkosh public high school?
"A. Yes, Your Honor.
"Q. Have you had any experience in working? Have you held any type of job?
"A. Yes, I have.
"Q. What has been your usual type of employment?
"A. Well, I only worked for a few days and that was under construction.
"Q. Are you a single man?
"A. Yes.
"Q. I presume that you have given some thought to this question since your original apprehension?
"A. Yes, I have.
"Q. And you have been told by probably the District Attorney of Brown

County of your privilege of having an attorney?
"A. I have, sir.
"Mr. Grant: If the Court please, in order to clarify the record, I have advised Mr. Spanbauer this morning of the fact that he is entitled to counsel, and I told him that he has that right under the Constitution, and I explained the procedure to him quite thoroughly so that I think he understands.
"Q. All right. And do you feel, Mr. Spanbauer, that you understand that choice of an attorney?
"A. Yes, I do.
"And then the record may show that the defendant in this case has waived counsel and his waiver is now accepted by the Court as being an intelligent waiver of his right."

informed of the range of allowable punishments and of possible defenses or mitigating circumstances.

■■ There is no question that under the Sixth Amendment, Spanbauer was entitled to counsel in the state courts. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Furthermore, state defendants are guaranteed assistance of counsel under the Fourteenth Amendment, unless it is intelligently and understandingly waived. Carnley v. Cochran, 369 U.S. 506, 512–513, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962). Waiver of counsel standards as articulated in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), have been said to be applicable to asserted waivers of the right to counsel in state criminal procedings. Carnley v. Cochran, supra, at 515, 82 S.Ct. 884.

In *Zerbst*, the Supreme Court stated:

"The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances, surrounding that case, including the background, experience, and conduct of the accused." *Zerbst*, supra, 304 U.S. at 464, 58 S.Ct. at 1023.

In *Carnley* the Court clarified what must be shown of record on the question of waiver under a petition for a writ of habeas corpus:

"The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." *Carnley*, supra, 369 U.S. at 516, 82 S.Ct. at 890.

■ Thus, a federal court in coming to a decision after a hearing on a writ of habeas corpus alleging invalid waiver of counsel is, at the very least, to make a determination whether the accused intelligently and understandingly rejected counsel by applying the ad hoc test of *Zerbst*.

But we are faced with the further question whether the failure of the district court to enforce federal waiver standards as found in Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), may lead to an undermining of the rights of indigent defendants to appointment of counsel as expressed in *Gideon*, supra.

■ In *Von Moltke*, the Supreme Court set out federal standards for the duty of a trial judge in determining whether a waiver of counsel has been intelligent and competent.

"To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." *Von Moltke*, supra, at 723–724, 68 S.Ct. at 323.

It is urged upon us that these standards fully apply in the determination of a state prisoner's intelligent and understanding waiver of counsel.

We may sharpen the issue even more by noting that in *Von Moltke*, as in the instant case, the defendant received information, advice and counsel about the indictment, about the legal questions involved in a trial and other matters from

government agents. With respect to that fact, the Court said:

"The Constitution does not contemplate that prisoners shall be dependent upon government agents for legal counsel and aid, however conscientious and able those agents may be." *Von Moltke*, supra, at 725, 68 S.Ct. at 324.

The Wisconsin Supreme Court has recognized the trial judge's responsibility and has established standards somewhat similar to those found in *Von Moltke*.[2] But, however close those standards may seem to those in *Von Moltke*, we must assume that since the Wisconsin Supreme Court refused to have a hearing on Spanbauer's petition for habeas corpus, it was satisfied that its own standards had been followed. Thus, on our assumptions from an unclear record that Spanbauer was not informed of specific sentences, possible defenses or mitigating circumstances, it is clear that the Wisconsin standards are not as comprehensive or strict as the federal standards, at least as expressed in *Von Moltke*.

It is also clear that the federal district judge in coming to a decision on Spanbauer's habeas corpus petition, assumed that the *Von Moltke* standards did not fully apply.

In order to resolve the question raised, we have undertaken a brief review of federal decisions in this area.

It appears that federal courts have looked to the substance of the *Von Moltke* formulations, and not to its formulas. See, e. g., Johnson v. United States, 5 Cir., 344 F.2d 401, 404 (1965); United States v. Washington, 3 Cir., 341 F.2d 277, 284–285 (1965), cert. den. sub nom. DeGregory v. United States, 382 U.S. 850, 86 S.Ct. 96, 15 L.Ed.2d 89 (1965); Verdon v. United States, 8 Cir., 296 F.2d 549, 553 (1961), cert. den., 370 U.S. 945, 82 S.Ct. 1590, 8 L.Ed.2d 811

(1962); Hinton v. United States, 5 Cir., 232 F.2d 485, 487 (1956). *Von Moltke* has been taken to require a hearing or a searching inquiry by the trial judge, Coates v. United States, 106 U.S.App. D.C. 389, 273 F.2d 514, 516 (1959); Arnold v. United States, 4 Cir., 271 F.2d 440, 442 (1959); or that the trial judge be convinced the defendant had "a broad understanding of the whole matter", United States v. Kniess, 7 Cir., 264 F.2d 353, 356 (1959); or that "the accused fully understands the charges against him and the possible adverse consequences of not having counsel to represent him", Smith v. United States, 5 Cir., 216 F.2d 724, 726 (1954). Even when noting or expressing some of the *Von Moltke* standards, federal courts have failed to recite the remainder of them which would have been inconsistent with the result obtained in the case, a result reached by the application of the *Zerbst* standard, a knowing and understanding waiver. See United States v. Washington, supra; Hinton v. United States, supra.

Federal courts, noting, expressly or indirectly, that *Von Moltke* established guidelines for federal district courts respecting waiver of counsel, have nonetheless viewed the question of waiver of counsel as ultimately an issue, irrespective of the trial court's fulfillment of its *Von Moltke* duties, of whether the accused knowingly and intelligently chose to waive counsel. See United States v. Smith, 4 Cir., 337 F.2d 49, 55 (1964), cert. den., 381 U.S. 916, 85 S.Ct. 1542, 14 L.Ed.2d 436 (1965); Post v. Boles, 4 Cir., 332 F.2d 738, 742 (1964), cert. den., 380 U.S. 981, 85 S.Ct. 1346, 14 L.Ed.2d 274 (1965); Twining v. United States, 5 Cir., 321 F.2d 432, 434–435 (1963)[3]; Aiken v. United States, 4 Cir., 296 F.2d 604, 607 (1961); Starks v. United States, 4 Cir., 264 F.2d 797, 799 (1959).

2. State v. Strickland, 27 Wis.2d 623, 135 N.W.2d 295 (1965); State ex rel. Burnett v. Burke, 22 Wis.2d 486, 126 N.W.2d 91 (1964).

3. In *Twining*, without expressly so stating, the court appeared to treat *Von*

*Moltke* as a case *sui generis*. Footnote 1 at 435 of 321 F.2d indicates that the court felt that *Zerbst* and not *Von Moltke* was the controlling law even in federal cases.

Such applications as there have been of *Von Moltke* to state proceedings have not relied on the literal language or application of the *Von Moltke* standards, but upon the proposition that the trial judge has some duty to make an investigation into the circumstances to determine whether the petitioner had intelligently and competently waived his right to counsel. See McBee v. Bomar, 6 Cir., 296 F.2d 235, 237 (1961).

Even where it appears that a federal court may have applied both *Zerbst* and *Von Moltke* standards to proceedings in a federal court, the result has not been to vitiate the waiver, but to require a hearing in which the burden of proof to establish an invalid waiver is upon the defendant or petitioner. See Vellkey v. United States, 6 Cir., 279 F.2d 697 (1960); United States v. Wantland, 7 Cir., 199 F.2d 237 (1952); Taylor v. United States, 10 Cir., 193 F.2d 411 (1952); Cherrie v. United States, 10 Cir., 179 F.2d 94 (1949). Cf. United States v. Lester, 2 Cir., 247 F.2d 496 (1957); Sanders v. United States, 5 Cir., 205 F.2d 399 (1953). See also Davis v. United States, 8 Cir., 226 F.2d 834 (1955). Contra, Shelton v. United States, 5 Cir., 242 F.2d 101 (1958), set aside on rehearing, 246 F.2d 571 (1957), revd., 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed. 2d 579 (1958).[4]

The only federal cases apparently using some part of the *Von Moltke* standard as controlling are those which also indicate an actual and gross unfairness in the failure to apply the standard. See Gannon v. United States, 6 Cir., 208 F.2d 772 (1953); Sanders v. United States, supra; Snell v. United States, 10 Cir., 174 F.2d 580 (1949).

Only a few federal courts have expressly considered the question whether *Von Moltke* or *Zerbst* standards are to be applied to the determination of waiver of counsel. In Collins v. United States, 8 Cir., 206 F.2d 918, 922 (1953), the court said:

"In its ultimate analysis, it seems to us that the question here thus gets down to whether such a declaration as has been made by the Supreme Court in the case of Von Moltke v. Gillies * * * is required to be read as intended to lay down as an absolute rule of law that no waiver of counsel can or will be permitted to exist unless the trial court has expressly made statement in the courtroom to a prisoner of his right to such assistance, or whether it is entitled to be read as rather being emphasizive of a precautionary and responsible rule of practice on the part of the trial judge, which *ought as a protection to the prisoner to be scrupulously observed.*

"We do not believe that the Supreme Court meant to hold that jurisdiction cannot at all exist in a trial court to accept a plea of guilty or to impose sentence upon such a plea, unless the court has first made formal declaration from the bench of the prisoner's right to the appointment and assistance of counsel and has engaged in supplementary inquiry, and that all sentences which have in the judicial informalities of the past half century or more been so pronounced must consequently be branded as legal nullities and void incarcerations, regardless of whether the prisoner in fact knew of his right to such appointment and whether he understandingly intended at the time to forego such assistance. At least, we do not think that any such legal concept has heretofore obtained in the federal system. Always the question seems to have been regarded as being one of appraising, on all the probative elements and circumstances

4. Respecting *Von Moltke*, however, the court of appeals said: "The record does not show that the district court complied with the requirements of the *Von Moltke* case * * * in making certain that the accused's waiver of counsel was intelligently made. We would, however, be loath to reverse upon that ground alone in view of the movant's unusual intelligence and obvious experience." *Shelton*, 242 F.2d 101, 112 (1957). This statement seems to indicate that the *Von Moltke* standard is not by itself considered controlling in federal cases.

of each particular situation, whether as a matter of knowledge and intent on the part of the prisoner, there existed in fact a competent and intelligent waiver by him of the assistance of counsel in what he did—and the prisoner has been required to assume the unsuperficial burden of establishing and satisfying that no such waiver by him did in fact exist. Cf. Johnson v. Zerbst * * *."

In Aiken v. United States, supra, 296 F.2d at 607, the court expressly repeated and adopted the standards of *Von Moltke* for federal courts, but went on to state that the failure of a federal district court to perform its duties with respect to waiver of counsel does not of itself render the proceedings unconstitutional or invalidate them, for there was yet required a showing that the defendant did not understandingly waive his rights. Accord, Post v. Boles, supra; Starks v. United States, supra.

■ The fundamental right to counsel is not deprived an accused in a state court criminal proceeding if that court had accepted a waiver of counsel after a determination reflecting that under the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused, the waiver was made by the accused intelligently and understandingly, with knowledge of his right to counsel, even if indigent. *Zerbst*, supra; *Carnley*, supra; *Gideon*, supra.

■■ While allegations or a showing that the trial court did not make such a determination would prima facie establish a ground for a habeas corpus *hearing*, the burden on a petitioner who has affirmatively waived counsel is to show by a preponderance of the evidence that the waiver was not made intelligently or understandingly. *Zerbst*, supra; United States v. Morgan, 346 U.S. 502, 512, 74 S.Ct. 247, 98 L.Ed. 248 (1954); Moore v. State of Michigan, 355 U.S. 155, 161–162, 78 S.Ct. 191, 2 L.Ed.2d 167 (1957). A preponderance of the evidence is not created by allegations and a showing that the state court trial judge did not literally fulfill all elements of a formula describing his responsibilities for acceptance of waiver of counsel. Substance rather than form is the guiding criterion for reviewing courts.

■ We recognize that Spanbauer's commission, within a short time, of a series of related crimes, together with his background, general behavior and the reports of the psychiatrists and psychologists from the Wisconsin sexual deviate facility indicate that Spanbauer was mentally and emotionally disturbed. But the fact of such disturbance does not itself require the conclusion of incompetency to waive counsel. It is not necessary to review the general question whether Spanbauer was or was not mentally disturbed. The only question for the federal district court was Spanbauer's competence to waive counsel intelligently and understandingly. That question was one of the central issues in the full evidentiary hearing conducted by the federal district court in this case.

■ Following a thorough review of the record, and under the standard applicable in the assessment of the validity of a waiver of counsel in a state court proceeding, we conclude that the district court did not err in its findings that Spanbauer was advised of his right to counsel, even if indigent, and that he was competent to waive counsel. Spanbauer has not shown by a preponderance of the evidence that he did not waive counsel intelligently and understandingly.

■ Assuming that Spanbauer did desire counsel at his sentencing on May 3, 1960, he did not communicate this to the court. Furthermore, the fact that no further sentence was added on May 3, but rather commitment to the sex deviate facility for treatment, leads us to conclude that the district court did not err in finding no prejudice to Spanbauer in this respect.

In conclusion, we find the record clearly shows that the federal district court granted and fairly conducted a full evidentiary hearing on Spanbauer's habeas corpus petition. Spanbauer was ably

represented by counsel at this hearing. We hold that, on the record before us, Spanbauer has not sustained his burden of proof.

Spanbauer was represented on this appeal by Mr. L. C. Hammond, Jr., a reputable member of the Milwaukee, Wisconsin bar pursuant to appointment by this court. We commend Mr. Hammond for his unusually excellent service rendered in this case.

The judgment of the district court is affirmed.

Affirmed.

KILEY, Circuit Judge (dissenting).

I respectfully dissent because I think petitioner's waiver of counsel was made under circumstances which denied him due process under the Fourteenth Amendment.

Spanbauer was born in January, 1941. According to his testimony, when he was eleven or twelve years old he was arrested for stealing. His next brush with the law was for purse snatching. After each of these offenses he was merely given a warning. When Spanbauer was about fourteen, he was convicted of breaking and entering and was placed on a year's probation. Shortly after his burglary conviction, his father died. Just after his seventeenth birthday, in January, 1958, Spanbauer, then a junior in high school, quit school and joined the Navy.

Spanbauer served in the Navy for two years, during which he was arrested for carrying concealed weapons and for robbery. The charges were dismissed. He was given a "bad-conduct" discharge from the Navy in November, 1959. After each pre-Navy arrest and in the Navy, psychiatric treatments were recommended for him, but he received no treatment. He worked for about a month after his discharge, and in January, 1960, returned to high school as a junior.

On February 15, 1960, Spanbauer, then barely nineteen, was arrested in Sheboygan on charges of carrying a concealed weapon and petty larceny. He was given probation but detained because he admitted he had stolen the weapon in a burglary in Wauwatosa, a suburb of Milwaukee. On the afternoon of Thursday, February 18, Spanbauer was driven to the Wauwatosa Police Station from Sheboygan. In the squad car, he admitted the Wauwatosa burglary "to get everything off [his] chest." On Friday, Spanbauer was questioned for about two and one-half hours at the Wauwatosa Police Station and then taken to Waukesha during the afternoon for a lie detector test. He made no admissions on Friday. Spanbauer was brought before a magistrate on Saturday morning and then taken to the Milwaukee County Jail. That afternoon, when confronted with evidence linking him with another burglary in the Milwaukee area, he said that he had something to get off his chest, but that he would not talk to anyone but the district attorney.

A member of the Milwaukee County District Attorney's Office was summoned, and Spanbauer confessed to nine of the crimes of which he was later convicted in Brown County. Authorities from the counties where these crimes had been committed were called in, and on Sunday, two further statements were taken, one by the Appleton and Neenah police and one by the Green Bay authorities.

On Tuesday, February 23, Spanbauer was taken to Green Bay, in Brown County, for trial on the offenses committed there.

Spanbauer was examined by a magistrate on February 24 for armed robbery, rape and conduct regardless of human life, all alleged to have been committed January 12. The charges were read to him. Asked if he understood the charges and understood that they were felonies for which he could be subject to imprisonment, Spanbauer answered "Yes, sir." The court informed him of his "right" and "privilege" to have an attorney and that if he "would like to have a lawyer, a reasonable period of time [would] be allowed by the Court to make the necessary arrangements." The court asked Spanbauer if he preferred

to "go through the entire proceedings without a lawyer." He said "Without a lawyer." The court then inquired into the intelligence of his choice by inquiring about his education and work record. The court asked him if he had "been told by probably the District Attorney" of the "privilege" of an attorney. Spanbauer said he had. The prosecutor then stated he had told Spanbauer of his constitutional right to a lawyer. The judge said, "All right. And do you feel * * that you understand that choice of an attorney?" Petitioner said he did. The court then accepted the waiver as being intelligent.

The magistrate explained to Spanbauer that he was entitled to a preliminary hearing before proceeding further and said it was a "privilege" he could give up just as he had given up his right to an attorney. Spanbauer said he would like a hearing on the third count: "I didn't mean to shoot." The court said, "Then do I understand you'd like to have a preliminary hearing on the third count?" Spanbauer answered, "I don't know for sure." Asked again as to the third count petitioner said, "Well, I don't know, Your Honor. I didn't mean to shoot him that's all."

At this point the prosecutor requested leave to explain it to Spanbauer. He did so out of the magistrate's presence. Spanbauer then waived preliminary hearing on the third count. He was bound over for arraignment and trial.

The magistrate, assuming his duties as trial judge, asked the prosecutor if he was ready to proceed. The prosecutor read the information. The judge again asked Spanbauer, "Do you wish to have a lawyer represent you in this case?" Spanbauer said "No." The "waiver" was accepted and Spanbauer pleaded guilty to each of the three counts. The case was placed on the calendar for Monday, February 29, for the purpose of taking testimony on the three counts and to permit the defendant to consolidate counts from other counties.

At the February 29 hearing the same judge told Spanbauer that the three counts he had pleaded guilty to were "transferred to the Amended Information," and asked him if he understood. Spanbauer answered "Yes, sir." The court noted Spanbauer had signed a written application to have seven additional counts transferred to the Brown County Municipal Court from three other counties where the offenses were alleged to have been committed, because of his decision to plead guilty to all charges. Spanbauer admitted signing the application. He was then asked whether he waived preliminary hearing as to the seven additional counts. He said "Yes, sir." He was bound over for trial.

The arraignment followed immediately. The court asked "And do you also waive your privilege of having an attorney on the seven additional counts?" Spanbauer answered "Yes, sir." He then pleaded guilty to the ten charges of armed robbery, rape, conduct regardless of human life, attempted rape, theft and burglary while armed.

The trial judge heard the testimony of nine witnesses for the prosecution, including the victims of the rape, shooting (conduct regardless of life) and burglary while armed. Three of the five law enforcement officers who testified read confessions they had obtained from Spanbauer into the record. Two of the confessions related the same lurid and detailed story told by the first witness, the rape victim. One of the police officers read the Police Complaint Record of one of the burglary counts into the record. Nineteen exhibits for the prosecution were received into evidence. At the conclusion of the case for the prosecution, the trial judge found Spanbauer guilty on each of the ten counts, and asked him if he wished to make any comment relative to any of the counts. He said he did not. The judge asked him if the testimony was a true account of the crimes charged and if he thought he had been given a fair hearing. Spanbauer answered "Yes, sir" to each question. The court received statements from the district attorneys from each of

the counties involved and then asked for any comment the prosecutor might have.

The prosecutor said, among other things, "I think the Court must realize that the defendant to be engaged in crimes such as these, that he must be somewhat ill," but he said the court should consider a "severe sentence" in view of the impact of the case on the Green Bay area. After a one-hour recess, the court imposed the maximum sentence on each of the eight counts other than the sex offenses, arranging them to run for a total of seventy or eighty years, depending on construction of the order. The court added that any future parole would be attended with great danger.

Pursuant to the Wisconsin "Sex Deviate Law," Wis.Stats.Ann. § 959.15 (1958 & Supp.1966), the court committed Spanbauer to the Department of Public Welfare for a pre-sentence social, physical and mental examination with respect to the sex crimes. Two months later, the Department of Welfare reported that Spanbauer was "very disturbed," "extremely dangerous" and a "fit subject for commitment under the Sex Deviate Law." Just before the commitment hearing Spanbauer had told the prosecutor he wanted a lawyer. The prosecutor told him to tell the judge. Spanbauer did not, and the prosecutor, feeling no duty to tell the judge of petitioner's desire, did not. Spanbauer was committed to an indeterminate term under the Sex Deviate Law, to run concurrently with the sentence on the other counts.

For purposes of this dissent, I will agree with the majority that the courts have not strictly applied the standards in Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316 (1948), but rather have focused upon the particular facts concerning the defendant in each case to determine whether a waiver of counsel was voluntary and intelligent. There is still, nevertheless, a "serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." Johnson v. Zerbst, 304 U.S. 458, 465, 58

S.Ct. 1019, 1023 (1938). Even if the focus is to be upon what the defendant knew or should have known, apart from what he was told by the court, in my opinion the inquiry of the Wisconsin court, while acting both as magistrate and trial judge, was inadequate, either to insure an intelligent and voluntary waiver or to inform Spanbauer of what he did not know and could not have known.

No claim is made here by Spanbauer that his mental state vitiated his capacity to make a valid waiver. But it is a fair assumption that he was no healthier mentally two months before the psychiatric report, when the prosecutor told the judge before sentence that he "must be somewhat ill." And that fact bears on the question of the "fundamental fairness," Cox v. Burke, 361 F.2d 183, 186 (7th Cir. 1966) of the proceedings. Spanbauer's mental condition was an essential "background" fact, Johnson v. Zerbst, 304 U.S. at 464, 58 S.Ct. 1019, to be considered in the court's determination of whether he had a "broad understanding of the whole matter." Von Moltke v. Gillies, 332 U.S. at 724, 68 S.Ct. at 323. Within several minutes, nineteen-year-old "disturbed" Spanbauer was required to decide whether to have a preliminary hearing on the original three counts, whether to plead guilty to them and whether to waive representation by an attorney. Five days later he had to decide whether to have the original three counts included in the amended information, whether to plead guilty again and whether again to waive counsel. The majority opinion recognizes that the psychiatric reports of the Wisconsin Department of Public Welfare were of "such a nature as to raise the question of Spanbauer's general competency."

In my view the confessions of February 20 and 21 should have raised serious doubts as to Spanbauer's general competency in the minds of the police officers, prosecutor and trial judge. Six of the crimes of which Spanbauer was convicted were committed during a one-

night crime spree, and the details of each would indicate even to a layman that Spanbauer was seriously disturbed. In his confession of February 20 he volunteered the reason for the spree: "All this started out because I owed two hundred dollars in bills out in California, and I had received the bills presently, the day before." Since the judge was well aware of the details of the crimes after the testimony of the victims and the admission of the confessions, he had a good opportunity to determine Spanbauer's mental competency to have made a waiver.

I believe my view is confirmed by the psychiatric reports of the Wisconsin Department of Public Welfare, submitted to the state court before sentencing pursuant to the Sex Deviate Law and received in evidence by the district court in the habeas corpus hearing. The final recommendations of two psychiatrists indicate not only that Spanbauer was "extremely disturbed" and a "boy" with "severely distorted" judgment but also that he could not and had not ever received help from anyone.[1]

Spanbauer's mental condition at the time of his waiver of counsel, the totality of circumstances while he was in custody and throughout the hearings, the inadequate inquiry at the preliminary hearing and the informal carryover of the waiver to the trial are the considerations justifying my conclusion that the waiver was invalid. In Johnson v. United States, 344 F.2d 401 (5th Cir. 1965), the court reversed a finding that a waiver of counsel was valid and remanded for a hearing to determine Johnson's mental competency, even though the evidence there was much less per-

---

1. These findings can be best understood in context.

a) Report of April 14, 1960:

The results of psychological tests indicate that this young man has Bright Normal intellectual potential. He has never functioned at the level of his potential, however, and his general behavior is indicative of impulsivity and poor judgment. He has little ability to reason through to the probable consequences of his behavior and is limited in his capacity to organize his activities. He is poorly motivated toward intellectual achievement. He tends to be preoccupied with his personal conflicts to the extent that it is difficult for him to concentrate on anything else.

This is a very disturbed and unhappy boy who presents ample evidence of severe personality conflict since early adolescence. He is quite immature in almost all areas of his behavior.

b) Report of April 28, 1960:

Although the patient does not demonstrate many objective manifestations of anxiety in the interview situation, it is apparent from the great deal of control he has to exert upon himself that he is in chronic severe distress. He reports having experienced symptoms of insomnia, nervousness and despair on many different occasions prior to his arrest. He at all times impresses one as a person who does a good deal of suffering which is kept completely to himself. He has not had the ability to utilize help from others in alleviating any of this suffering.

The patient's concept of himself is extremely low. He sees himself as being something far less than other human beings and as some sort of monster. He has never been able to free himself enough from his internal turmoil to set up realistic goals or levels of aspiration. His relationship with others has always been poor. He states, and I believe accurately, that he has never known another person well, confided in another person, helped or received help from another person, nor trusted another person.

* * * Since he attempts to ignore so many aspects of the reality situation, and to deny so many of his feelings, his judgment is often severely distorted.

There is no adequate diagnostic category for this boy. For classification purposes he would fall under sociopathic personality disturbance, but that diagnosis does not reflect the severity of his withdrawal and the very great potential he has for an acute psychotic reaction. This is a boy with whom the possibility of severe psychosis is always present given average sort of stresses on his personality. He is extremely disturbed and at this time he is extremely dangerous. * * *

suasive than in Spanbauer's case.[2] "[T]here are many shades and phases of mental disorders as well as degrees of severity, and * * * the law * * attaches different consequences to the presence of a particular mental disorder in a defendant at different stages of the trial process," id. at 406,—especially where the waiver of "by far the most pervasive" [3] constitutional right is concerned.

Spanbauer had no experience in court, as did the defendant in Cox v. Burke, 361 F.2d 183 (7th Cir. 1966),[4] or even in business as in Butler v. Burke, 360 F.2d 118 (7th Cir. 1966), cert. denied, 87 S.Ct. 79 (U.S. Oct. 10, 1966) (No. 325).[5] His only previous experiences with the law resulted in leniency. Neither these nor his other background and experience gave him any reason to expect a seventy-year sentence, or gave him any help in conducting his defense or understanding the procedure of the Sex Deviate Law.[6]

In contrast to this, the Supreme Court's *Von Moltke* decision rested in part upon the *possibility* of capital punishment or a thirty-year sentence even though the defendant was the well-educated and intelligent wife of a university professor and in fact received a sentence of only four years. 332 U.S. at 709, 68 S.Ct. 316. Spanbauer had no way of comparing the benefits of having counsel with the difficulties of conducting one's own defense as did the defendant in Cox v. Burke, 361 F.2d at 185. Just as the defendants in Johnson v. Zerbst, Spanbauer was faced with rapid-fire legal proceedings, totaling ten days from arrest to sentencing.[7] His passive participation in his "defense" stands in contrast even to the amateurish and brief efforts of the defendants in Johnson v. Zerbst. Somewhat as in *Von Moltke*, the Spanbauer proceedings were conducted in an atmosphere suggestive of hostility in a community where, as the prosecutor told the

---

2. The testimony of the psychologist as to Johnson's mental state at the time of the 2255 hearing was:
   * * * [H]e was an antisocial sociopath, with some emotional instability, some general resentment and hostility towards society, with some tendency toward depression at times, but not of psychotic proportions.
   I concluded that he was sane in the legal sense or, speaking in the terms of our profession, without psychosis, and I found no evidence in my study of his case of his ever having been psychotic or insane or incompetent.
   Johnson v. United States, 344 F.2d at 408.

3. Schaefer, Federalism and State Criminal Procedure, 70 Harv.L.Rev. 1, 8 (1956), cited in Johnson v. State of New Jersey, 384 U.S. 719, 728, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

4. Although Cox had low intelligence, he was thirty-seven years old and had a record of three convictions, including manslaughter and burglary. He pleaded guilty to the burglary charge after waiving counsel and, prior to his second conviction, had retained counsel, who was able to obtain a reduction in charge (from second degree murder to manslaughter) in return for a guilty plea. 361 F.2d at 185.

5. Butler was thirty-four years old, had a college degree, had done graduate work in business administration, was employed by a large corporation and had been convicted previously of a minor but similar offense. The Seventh Circuit held, Judge Kiley dissenting, that the failure of the trial court to inform Butler of the provisions of the Wisconsin Sex Deviate Law, Wis.Stats.Ann. § 959.15 (1958 & Supp. 1966), did not affect his otherwise voluntary waiver of counsel. 360 F.2d at 120–124.

6. In addition, the psychiatric reports indicated that Spanbauer had no appreciation of the seriousness of the charge or of the suffering he had caused.

7. In Johnson v. Zerbst, the defendants were arrested on November 21, indicted on January 21, and arraigned, tried, convicted and sentenced on January 23. They never left prison after November 21, 304 U.S. at 459–460, 58 S.Ct. 1019. It should be noted that in *Von Moltke*, where the waiver of counsel was also held invalid, the preliminary proceedings lasted over a period of seven weeks, not including a later attempt to withdraw a plea of guilty. 332 U.S. at 711–718, 68 S.Ct. 316.

trial judge, people were not used to locking their doors.

Turning now to the courtroom proceedings, I think it is clear that the waiver of counsel was invalid. The Wisconsin trial judge did not advise Spanbauer that if he was indigent the court would appoint counsel for him. The judge relied upon the prosecutor's statement that he had advised Spanbauer of his constitutional right to an attorney, and the judge did not ask what the advice was.[8] There was no advice by the prosecutor in the judge's presence as in Johnson v. United States, 344 F.2d at 404 (dicta). See Arnold v. United States, 271 F.2d 440, 441 (4th Cir. 1959).[9] The "waiver" accepted at the hearing of February 24 was extended at the subsequent trial without formality, Spanbauer saying he understood the right waived with his recurring "Yes, sir." But saying so does not make it so. See United States v. Washington, 341 F.2d 277, 284 (3rd Cir.), cert. denied, DeGregory v. United States, 382 U.S. 850, 86 S.Ct. 96 (1965). Spanbauer's request to the prosecutor for an attorney at the commitment hearing was treated with indifference. The only references to possible penalties were the court's statement that the charges were felonies calling for imprisonment, and the prosecutor's out-of-court statement that he could get quite a "good jolt." He was not told of any possible defenses or mitigating circumstances, even, so far as the record shows, when he expressed doubt about waiving preliminary hearing on the conduct regardless of life charge with the unsophisticated "I didn't mean to shoot."

This record is not like the one in this court's decision in United States v. Kniess, 264 F.2d 353, 356 (7th Cir. 1959), where the court thought by experience and knowledge Kniess, under the Von Moltke decision, had a "broad understanding of the whole matter."[10] Nor is this record like that in Verdon

---

8. In the hearing before the district court on the habeas corpus petition, the prosecutor testified on direct examination that on the morning of the arraignment he had talked with Spanbauer and advised him of his rights, including the right to counsel. He testified that "At each of these occasions his [Spanbauer's] response was that he wanted to get the matter over with as quickly as possible." The following then ensued:

Q. Did you give him any advice one way or the other with reference to whether he should accept counsel?

Prosecutor: We had a conversation relative to the hostility of the community. I believe that I explained to him that the community as a whole was afraid for the period of three to five weeks after the particular crimes were committed. I did not say if I were in his shoes that he should have counsel, but I recall I told him that if he did not have any money that the county would appoint him counsel. I further told him on several occasions that because of the particular attitude of the community that he probably would get a good jolt. But he was asked on three or four occasions during that half hour that I talked to him whether or not he wanted counsel, and was informed of his right to counsel.

Q. What response did he make with reference to whether he wanted counsel?

Prosecutor: He repeated on those occasions that he wanted to get the matter over with as soon as possible.

One of the officers who accompanied Spanbauer on the drive from Sheboygan to Wauwatosa testified to similar answers in response to being informed of his right to court-appointed counsel if he was indigent. Spanbauer himself testified that he thought he might get a break from the court and that, "actually [he] didn't care one way or another, either."

9. In Arnold, the Fourth Circuit reversed an order denying a motion to vacate the ten-year sentence of defendant, who the record indicated was not "a normal man," holding that the duties of the court "cannot be discharged in extrajudicial interviews by the probation officer," even though defendant had a long criminal record. 271 F.2d at 441.

10. Kniess had spent about seven years in prison, had previously been convicted of robbery, grand larceny and possession of unregistered firearms, conducted himself well in the courtroom and there was "no indication of any doubt or confusion" on his part. The Seventh Circuit held the failure of the trial court to inform Kniess of a possible defense (an invalid confession) or of the allowable punishment did not invalidate his waiver of counsel. 264 F.2d at 356.

v. United States, 296 F.2d 549 (8th Cir. 1961), cert. denied, 370 U.S. 945, 82 S. Ct. 1590 (1962), where Verdon, who had "quite a list" of previous convictions, claimed a Sixth Amendment violation because of a failure to inform him of the maximum punishment for escaping from federal prison. The court there thought that this factor was but one of several stated in *Von Moltke* and not enough to require vacation of sentence.

I think the uncontradicted record proves an invalid waiver, so that I see no question of a preponderant showing by Spanbauer. I would reverse and remand for the district court to vacate the judgment of conviction on the ten charges, unless Wisconsin grants him a new trial within a reasonable time.