**Glenn L. DES BOUILLONS, Petitioner-Appellant,**

v.

**John C. BURKE, Warden, Respondent-Appellee.**

**No. 17168.**

United States Court of Appeals
Seventh Circuit.

Oct. 7, 1969.

Thomas T. George, Madison, Wis., for appellant.

Robert W. Warren, Atty. Gen., Sverre O. Tinglum, Asst. Atty. Gen., Madison, Wis., William A. Platz, Asst. Atty. Gen., for appellee.

Before CASTLE, Chief Judge, KILEY, Circuit Judge, and GRANT, District Judge.*

KILEY, Circuit Judge.

The district court dismissed petitioner's habeas corpus petition without an evidentiary hearing. Petitioner appeals. We reverse and remand.

On November 5, 1945, petitioner was convicted in a Wisconsin county court on guilty pleas under six charges of operating a motor vehicle without the owner's consent,[1] three counts of larceny from the person,[2] and four counts of other larceny.[3] The sentences were various, concurrent and consecutive, and totaled fifteen years.

In August, 1947, he was convicted again on guilty pleas under four counts of larceny,[4] breaking and entering,[5] kidnapping,[6] escape,[7] and a "repeater violation."[8] The sentences for these violations were also various, concurrent and consecutive with respect to the 1945 sentences, bringing petitioner's total sentences to sixty-five years.

The question for us is whether the district court should have granted an evidentiary hearing upon petitioner's claim that his Sixth Amendment right to counsel was violated because he did not intelligently waived counsel at the 1945 proceeding[9] in Wisconsin court. Respondent concedes counsel was not appointed for petitioner at the 1945 proceeding.

Twenty-two years after his convictions petitioner filed a petition for habeas corpus in the Wisconsin Supreme Court asserting, among other things, ignorance of his right to counsel at public expense. Respondent's answer relied upon the theory of waiver of counsel by petitioner. The court designated a state circuit court as referee to take evidence and make findings with respect to the issue of waiver. The sentencing judge and prosecutor having died in the interim, the referee in May, 1967, heard only the testimony of the former sheriff and petitioner, who was represented at the hearing by court-appointed counsel. The referee decided that petitioner had validly waived counsel in the state sentencing courts and the Wisconsin Supreme Court affirmed the referee's decision.[10]

The question of an effective waiver of a "federal constitutional right * * * is of course governed by federal standards." Boykin v. Alabama, 395 U. S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed. 2d 274 (1969).[11]

The district court set a hearing solely on the issue whether a federal court evidentiary hearing was required. Counsel was appointed for petitioner. The court heard oral argument upon the issue raised by the petition and respondent's response. The court found it unneces-

* Of the United States District Court for the Northern District of Indiana, sitting by designation.

1. Wis.Stat.Ann. § 343.18.

2. Wis.Stat.Ann. § 343.15.

3. Wis.Stat.Ann. § 343.17.

4. Wis.Stat.Ann. § 343.17.

5. Wis.Stat.Ann. § 343.11.

6. Wis.Stat.Ann. § 340.54.

7. Wis.Stat. § 346.40.

8. Wis.Stat.Ann. § 359.12.

9. This is the crucial hearing for petitioner, since without the conviction then, there can be no basis for the "repeater" conviction in 1947.

10. The referee concluded respondent had met his burden of proving petitioner's waiver was intelligently made.

11. In Carnley v. Cochran, 369 U.S. 506, 515, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962), the Supreme Court restated the rule that "the principles declared in Johnson v. Zerbst, [304 U.S. 458, 464-65, 58 S.Ct. 1019, 82 L.Ed. 1461] [are] equally applicable to asserted waivers of the right to counsel in state criminal proceedings."

sary to decide where the burden of proof lay and relied on Wisconsin law [12] placing the burden on respondent. The court decided that respondent had the burden of proving petitioner "affirmatively acquiesced", United States ex rel. Jefferson v. Fay, 364 F.2d 15 (2d Cir. 1966), in proceeding without counsel by showing (1) he had knowledge of his right to counsel at public expense, and (2) he had by "some affirmative word or act" consented to proceed without counsel. If that showing was made, the court held that petitioner had the burden of proving the "affirmative acquiescence" was not competent, understanding or voluntary. It concluded that since the Wisconsin sentencing court record did not show sufficiently that petitioner was "advised, or otherwise understood" his right to counsel there was no showing of record of an "affirmative acquiescence" by him.[13]

The district court held that nevertheless the sheriff's testimony that petitioner was informed "out of court" of the possible punishments facing him, and of his right to be represented by counsel at public expense if he could not afford one, met the state's burden. This holding was based on the referee's crediting the sheriff's testimony and not crediting that of petitioner to the contrary. The district court found that the record before thereferee supported the finding and that no federal evidentiary hearing was needed. The court denied the writ because, being thus informed of his right, and not alleging his acquiescence was not competent or understanding or voluntary, petitioner had "affirmatively acquiesced."

This is not a case where the court record is silent with respect to whether the court had adequately advised a defendant of his right. Here the respondent concedes the transcript shows the court's perfunctory questioning was inadequate to give the advice the Constitution requires to protect an indigent's right to counsel. The referee effectually decided that the sheriff's memory of events twenty-two years earlier sufficiently satisfied the Constitutional requirement.

■ "We are considering here the question of denial of by far the most pervasive constitutional right of a defendant in a criminal trial," the Sixth Amendment right to counsel. United States ex rel. Baldridge v. Pate, 371 F.2d 424 (7th Cir. 1966). The challenge of the respondent is directed at the state court record which admittedly is inadequate to show that petitioner waived his right to counsel. There is no question that both in Wisconsin and federal courts where the record is inadequate with respect to the question of waiver, proof may be made to supply the deficiency.

In Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962), the Supreme Court, in a right to counsel case, said "The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer." See

12. The district court distinguished the "burden" rule in the Wisconsin habeas corpus proceeding from that in federal courts stating that it "appears" that in federal court a habeas corpus petitioner has the burden of establishing he has not intelligently, voluntarily and knowingly waived his right to counsel, citing this court's decision in Spanbauer v. Burke, 374 F.2d 67 (7th Cir. 1966). In Van Voorhis v. State, 26 Wis.2d 217, 223, 131 N.W.2d 833 (1965), the court discussed the burden of proof on an issue similar to that before us, but under a Wisconsin statute. The court said that where the record shows compliance with the statute and an apparent waiver, the burden of proof was on the claimant to show the waiver of counsel was not intelligent, but where the record does not show compliance with the statute, the state had the burden.

13. This conclusion coincides with that of the Wisconsin rule. See fn. 12, *supra.* We think the Second Circuit's "affirmative acquiescence" rule, Jefferson v. Fay, is not unlike this court's "prima facie" rule in *Spanbauer*, 374 F.2d p. 74, and we think the inadequate record here shows "prima facie" no waiver and the burden of going forward was on the respondent.

also Boykin v. Alabama, 395 U.S. p. 242, 89 S.Ct. p. 1712. And in Moore v. Michigan, 355 U.S. 155, 161, 78 S.Ct. 191, 2 L.Ed.2d 167 (1967), the Court, observing that a court cannot force counsel on an accused not wanting one, said, however, a "finding of waiver is not lightly to be made."

■■■ We think the district court erred in accepting the referee's finding to be supported by the record as a whole and in deciding that an evidentiary hearing was unnecessary. We think too that the procedure at the hearing was not conducted in accordance with the Wisconsin burden of proof rule. In view of the inadequate 1945 record, the state had the burden of proof. The referee erred in proceeding with petitioner as first witness and subjecting him to testify to his remembrance of events at trial and cross-examination about his juvenile "record" and Wyoming criminal record, all in the presence of the sheriff, the only witness against petitioner. But we need not decide whether this irregularity was a serious procedural error requiring a federal hearing. Townsend v. Sain, 372 U.S. 293, 316, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

We think the district court ought not have accepted the premise of the referee's decision that the sheriff's testimony met the Wisconsin clear and convincing rule. Van Voorhis v. State, 26 Wis.2d 217, 223, 131 N.W.2d 833. The hearing before the referee held twenty-two years after petitioner's 1945 convictions and based on the oral testimony of the sheriff was, in our opinion, an unreliable basis for ascertaining the truth. Petitioner on one hand might be blamed for the delay of the hearing. But on the other hand when he was convicted he was a twenty-two year old grammar school "dropout" from a disrupted family, and had an IQ of 70.[14] And the lack of an adequate Wisconsin court record necessitated what hearing was had.[15]

We think the testimony of the sheriff was too hazy and general as a basis for reliable findings, Townsend v. Sain, *supra,* at 318, 83 S.Ct. 745, and the district court should have ordered a federal hearing. The "record as a whole" was essentially the inadequate state record, and the testimony of petitioner and sheriff.

Sheriff Becker's testimony first related to the usual practice in 1945 after an arrest of a suspect. He then turned to the out of court "advice" given petitioner: Before going to court, he testified, two days after arrest he, his Deputy Bluett and the district attorney on several occasions asked petitioner "if he had an attorney or was going to get one * * several different times * * * I think he was informed both by myself and * * * Bluett." [16]

14. According to one of his responses in the district court. At the referee's hearing he had an "IQ of 84 * * * borderline, dull normal intelligence."

15. See United States ex rel. Baldridge v. Pate, 371 F.2d 424 (7th Cir. 1966), for this court's comment on the failure to keep state court records; and the Supreme Court's concern in McCarthy v. United States, 394 U.S. 459, 470, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), that the intention of Rule 11, Fed.R.Crim.P., to "produce a complete record" be met and the court's view of unsatisfactory evidence taking the place of the official record: "There is no adequate substitute for demonstrating *in the record at the time the plea is entered* the defendant's understanding * * *." The Wisconsin referee was cognizant of this. The referee noted the difficulty in attempting to determine a factual situation which existed something like twenty-two years ago. "The determination might be a matter of pure chance rather than merit, based upon which witnesses survived. How can we accurately recreate a factual situation with three out of four material witnesses, other than the petitioner, deceased and the remaining witnesses understandably hazy on details?" See State ex rel. Des Bouillons v. Burke, Unpublished Opinion # 67/74 (Sup.Ct.Wis. 1967).

16. Testimony of Sheriff Becker:
Q. Do you recall talking—Do you recall whether or not the—you had any conversation with the defendant with respect to his desire for an attorney or not?
A. Well, he was asked on several oc-

casions if he had an attorney or was going to get one. We questioned him, I would say, several different times and I think he was informed both by myself and Cliff Bluett. He was our deputy in that office and he did considerable questioning and I knew him for that. That was his stand-out point; to give anybody under arrest, to give him his full rights and he informed him specifically that he had a right to an attorney.

Q. Were you present when he did this?

A. Yes.

Q. And when you say "he had a right to an attorney" what did he advise him?

A. Well, it is so long ago it is just about—I am dark on a lot of that stuff, but I wasn't too much concerned that way. I felt he was guilty and he wanted to get it over with and when he was asked if he wanted an attorney he didn't seem to take any interest or desire that he wanted one. That was his answer to us; that he didn't want any.

Q. Did you discuss at all—Was he informed that it was his right to have the Court appoint an attorney?

A. Oh, yes. He was informed that the Court would appoint him, if he wanted, and I don't know just how but the morning we left the District Attorney was there and he also informed him that if he wanted an attorney he would be entitled to one.

Q. Was there any discussion relative to his ability to hire an attorney?

A. Financially you mean?

Q. Yes?

A. I believe it was but he was notified to that; that the Court appoints an attorney for him if he has no funds to employ one.

Q. Mr. Becker, did you have any conversation with Mr. Des Bouillons about the possible sentence that he might receive?

A. We discussed it and if I remember right there was quite a number of different cases and that we were all, more or less, guessing what the sentence would be, but it was talked about; that I know.

Q. Did you discuss with him the possible maximum sentence under the charges that were then filed by the District Attorney?

A. It was discussed but I couldn't just remember the length, or the exact transactions that went on. I know it was discussed very thoroughly, about what—Because each individual crime was mentioned; what he was entitled to, or, what the Court could pass on him, but in a sum we didn't know what sentence would be passed on him.

*    *    *    *    *

Q. (Interposing) Well, on the first occasion that he was interrogated by Mr. Bluett in your presence. I want to know what the Defendant was informed of prior to the discussion?

A. Well, he was asked if he knows what he is being held for and he said he thought he was; that he knew and that is when this was mentioned to him; that we have these crimes against him and that we want to get them solved at this time; that they are quite lengthy and we would like to get it cleared up for his good and for the sake of the public and that was all explained to him at the time very thoroughly, if I remember.

Q. So, prior to this questioning he was not informed that he had a right to have a lawyer present?

A. That is the same. At that time— Oh, yes. Any statements he made he could make them at his free will or he could have his attorney to advise him or his statements were—That was Mr. Bluett's usual—That was his procedure.

Q. That was his usual first procedure?

A. That was our first procedure, but Mr. Bluett is what we called our old detective and he more or less handled it.

Q. Did you hear him give any instructions, in your presence, to this man?

A. Oh, yes, and he mentioned it, perhaps not specifically but he mentioned it, that—on different talks with him and one time when he went up to feed him, he had a little conversation with him right at the door. That was while arrangements were being made to plead guilty; that if he wanted to see an attorney or get one before he makes up his mind he better do it now.

Q. Now, you think this took place. Were you present?

A. No.

Q. You actually don't know?

A. Well, I couldn't say definitely.

Q. Of your own personal knowledge you don't know?

A. No. But when he went upstairs to feed that is the instructions he carried up. I didn't hear it myself.

Q. This is testimony concerning what you had laid down as the routine?

A. That's right.

We hold that the district court erred in accepting the testimony of the sheriff before the referee as "clear and convincing" proof, Van Voorhis v. State, that petitioner was sufficiently advised of his right to counsel so as to justify a conclusion of waiver. We hold that a federal hearing should be conducted for development of "clear and convincing" testimony which will lead to reliable findings upon which the essential question of waiver can be determined. We realize that it is probable that only the sheriff and petitioner will be available for the hearing—likely without corroboration, McCarthy v. United States, *supra*, 394 U.S. at 469, 89 S.Ct. 1166, aside from the record—and that the only benefit to be hoped for may be more particularized testimony of the sheriff adduced in proper sequence, with respondent having the burden of proceeding first to overcome the prima facie case made in petitioner's favor by the inadequate state record. Spanbauer v. Burke, 374 F.2d 67 (7th Cir. 1966).

Nevertheless, it is our view that respondent must produce clearer and more convincing evidence than was produced before the referee to justify the district court in adopting the referee's findings of fact with respect to petitioner's waiver of his Sixth Amendment right to counsel. If this clearer and more convincing testimony is unavailable it is not the petitioner, but the respondent who must bear the loss in view of the admittedly inadequate record of the state court proceeding.

The court expresses its appreciation to Mr. Thomas T. George, of the Wisconsin Bar, for his services as court-appointed counsel.

Reversed and remanded.

Q. But—

* * * * *

Any comments made about the possible total sentence; do I understand that was made by the Defendant and not by your officers?

A. Why, I couldn't recall exactly how that—What was mentioned, to that effect, because that I can remember faintly; that if he was committed the sentence for all these crimes under one sentence, that it would be much more lenient than if he sentenced on each case individually.

Q. He was promised that if he could clear up all these things it would go easier on him?

A. I wouldn't say we promised him anything, but that was partly assumed, I believe.

Q. Do you recall, specifically, any discussions had with the Defendant concerning his ability to pay for the services of an attorney?

A. Yes. I discussed that, I would say, at least on two different occasions.

* * * * *

Q. Now, this morning your testimony was that you believe that you told him that the Court would appoint counsel if he had no funds. Now, is your recollection—

A. (Interposing) Did I say believed? No. We told him that. That was specifically told him; that he could have counsel if he wanted.

Q. Now, where was this conversation?

A. That was at his hearing; when we questioned him, at one of the particular times; I will say one for sure, because we laid everything down and then the morning that we left, in the office, the District Attorney was there and that was laid down to him again; that he is entitled to an attorney and all, if I can recall right, he says, "Well, let's get it over with.".

Q. When you say he was entitled to an attorney was that the end of the specific conversation?

A. This was the morning we left for Court with him; for Waupaca.

Q. Was anything said to him on that occasion concerning the method with which he could pay an attorney?

A. Well, he was told that the Judge would appoint an attorney at the County's expense.

Q. And was he told that that morning on the way down?

A. Yes. That was one of the last things that was revealed to him. When we got into the car; what we were going for and if he was still willing to plead because we had to get his consent. There would be no sense taking him if he wasn't, and he said he was.