Bobby Gene **JOHNSON**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 21653.

United States Court of Appeals
Fifth Circuit.

April 19, 1965.

Leslie Harold Levinson, Melvin L. Wulf, New York City, for appellant.

H. M. Ray, U. S. Atty., Oxford, Miss., for appellee.

Before BROWN and BELL, Circuit Judges, and HUNTER, District Judge.

JOHN R. BROWN, Circuit Judge.

This appeal from the denial of Appellant's consolidated § 2255 motions seeking to have his 1961 sentences for larceny and contempt of court vacated because of lack of mental capacity to commit the offenses, waive counsel, plead guilty or stand trial presents primarily the question whether the § 2255 hearing was inadequate, not for courtroom deficiencies, but because of the restrictions imposed by the Court's earlier order calling for the pretrial psychiatric examination. Another important, but distinctive, problem is the propriety of the summary imposition of a three-year sentence for contempt, without benefit of counsel, for refusal to answer questions while testifying as a witness in another trial being held subsequent to his own conviction. We have concluded that there is merit in both of these complaints.

## I.

### Mental Competency

■ Johnson and others were charged with robbing two banks containing feder-

ally insured funds.[1] On August 4, 1961, he was arraigned, waived appointment of counsel, pleaded guilty and after a recess was sentenced to an aggregate time of 15 years.[2] Prior to his arraignment and while being interviewed by the Probation Officer in connection with the pre-sentence report, Johnson made a request for a mental examination. The basis expressed by Johnson was that he was always getting into trouble with the law, so there must be something wrong with him. There was no indication that this request was passed along to the United States Attorney or made known to the Judge. Also prior to arraignment, the Defendant's father wrote Judge Clayton asking simply "would it be possible to get a sanity hearing for him?" This letter was referred to the United States Attorney, but it apparently precipitated no action. Although 18 U.S.C.A. § 4244 requires the United States Attorney upon having "reasonable cause to believe * * [the defendant] insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, * * * *" to move for a mental examination of the accused, no motion was filed in this case, nor did the Judge enter an order on his own.[3]

■ Before discussing this further, it retains sequence to comment briefly on a matter distinct from mental capacity as such. This concerns the sufficiency of the waiver of counsel on arraignment. Johnson contends that, apart from the question of mental competency, the record fails to demonstrate a knowing, intelligent waiver. In the final analysis this comes down to the proposition that the

1. There were three separate indictments, two of them charging him with entering a bank with intent to commit larceny, and another for possession of property taken from one of them.

2. Johnson was sentenced to a total time of 35 years, but the sentences were to run concurrently. Indicating the careful, discriminating use of the pre-sentence reports is the fact that two other defendants, who similarly pleaded guilty

at the same time as Johnson, were with reason given far less severe sentences.

3. Although this circumstance bears upon the nature of the mental examination later required in these post conviction proceedings, we hold that neither the letter nor the information conveyed to the probation officer was such as to require a § 4244 motion or order at that time.

words concerning the right to have counsel appointed and the inquiry whether counsel was desired were spoken, not by the Judge, but by the District Attorney in open court. Of course the better practice is that these things should be done by the Judge himself. But it makes the assurance of this precious right a superficial, mechanical thing, not the one of basic substance which it really is, if the question of compliance is tested solely by *who* speaks.

Approaching it in the light of the fundamental nature of the guaranty, a reading of this record is convincing that through the solemn words spoken in the Judge's presence and to which he took no exception, these three defendants, separately addressed, were being informed by the very Court itself that they had the right to counsel if they were financially unable to obtain counsel, and that the Court would appoint counsel if desired. Equally plain is that with this explanation Johnson expressly waived appointment of counsel, and not a single piece of evidence from him or any other source on the § 2255 hearing indicates a lack of clear understanding of his rights and his knowing decision to proceed without a lawyer. Once it is judged on substance, not punctilious compliance with some stylized ritual, the District Court was justified in holding, as do we, that the demands of the law were satisfied. Von Moltke v. Gillies, 1948, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309; Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461.

▆▆ And as to the related matter of the actual plea of guilty which followed waiver of counsel, there can be no doubt. The Judge himself carefully, thoroughly, and separately interrogated each of the defendants to ascertain whether the plea as to each separate indictment was freely, voluntarily, and understandably made. In accepting each plea, he found separately that it was, and there is no suggestion, either in the records and papers or in the evidence on the § 2255 proceeding, which even raises any question about this conclusion, either then or now.[4]

But what has been assumed *arguendo* in disposing of these two contentions is really the central dispute in the § 2255 motion. The District Court properly regarded the petition as raising a substantial question requiring a hearing as to Johnson's mental competency.[5] Here the past indeed proves to be prologue, for at the time of sentencing Johnson brought up the problem of his mental-emotional health. Upon allocution, he made this request of the Court: "I would like if it is in your power to see if I can be treated while I am in prison. I need it, and for the things I have done in my life it has to be something wrong with me." The Court gave assurances that such treatment would be available.[6]

Four days later he was incarcerated at the penitentiary in Atlanta where, upon entering, he filled out a neuropsychiatric questionnaire in which once again he reiterated his request for psychiatric help. That apparently he did not then receive such treatment is hardly something he can ascribe to the Government. About a month later, presumably in connection with his appearance as a witness and the episode giving rise to the contempt sentence, Johnson escaped from Federal custody in Mississippi for which he was indicted under 18 U.S.C.A. § 751. In May 1963 he was apprehended in Florida where he was again the subject of Federal criminal proceedings not involved here.

---

4. Of course as to this and waiver of counsel just discussed, this assumes, as does Johnson's alternative contention, that he had the requisite mental competency.

5. Until the commencement of the hearing, mental competency related to the waiver of counsel and to the ability to stand trial only. A formal amendment was allowed raising specifically for the first time mental capacity to commit the offenses.

6. The Court: "You mentioned feeling the need for psychiatric treatment in spite of the fact that you have previously been in prison. You never have been in Federal prison before. There will be psychiatric treatment available for you if it is determined there that you need it."

Next came the filing, of Appellant's § 2255 motions in September 1963. In response the United States Attorney on October 25, 1963, filed a motion for judicial determination of Johnson's mental competency requesting that he be examined by the Board of Examiners at Atlanta established under 18 U.S.C.A. § 4241.[7] On the same day the Judge entered the order in the form submitted by Government counsel. It ordered that the Board examine Johnson to determine:

"[1] whether * * * petitioner-defendant is mentally incompetent; and [2] if so, then * * * whether or not * * * petitioner was mentally incompetent at the time [a] of his arrests and [b] convictions, and [c] his jail escape * * *."[8]

Appellant attacks this order and the fruit of the examination because by a succession of conditional inquiries, it effectively restricted examination to Johnson's present condition, that is whether he "[1] * * * is mentally defective" and then only "[2] if so" was the examination to consider the past. Since the psychiatric examination actually found him to be presently competent, the examiners were not required either to look to the critical time two years previous or to report their findings as to such time.

Appellant's argument, then, goes to the very heart of the kind of § 2255 hear-ing due him. For that reason and the likelihood of it recurring, this case presents an important problem. Especially is this so where, as here, there is a concerned and conscientious effort by both the United States Attorney and the District Judge to exploit fully governmental machinery through which the Court could be assured of obtaining reliable, scientifically trustworthy evidence upon which to arrive at a sound judicial determination of mental competence.[9] To provide illumination for the plenary hearing, outside professional help was needed. The Court with good reason thought governmental resources were the best. But with this conclusion, the problem arose of properly directing the professional inquiry to be made by the consulting psychiatric specialists, so that the results obtained would be responsive to the issues raised in the § 2255 motion.

At this point the distinction must be recognized between permissible use of some of this statutory machinery as an aid, on the one hand, and compliance with the law's requirements on the other. Thus, following Bishop v. United States, 1956, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835, this Circuit makes two things clear. First, mental competency may be raised by a § 2255 proceeding. Second, this right is not conditioned upon, nor satisfied merely by compliance with the procedures outlined in 18 U.S.C.A. §§

---

7. Section 4241 provides:

"A board of examiners for each Federal penal and correctional institution shall consist of (1) a medical officer appointed by the warden or superintendent of the institution; (2) a medical officer appointed by the Attorney General; and (3) a competent expert in mental diseases appointed by the Surgeon General of the United States Public Health Service."

This board is empowered to "examine any inmate of the institution alleged to be insane or of unsound mind or otherwise defective * * *."

8. For ease of reference the subdivisions are marked in [ ]; the order reads:
"It is, therefore, ORDERED: That the Board of Examiners for the United States Penitentiary, Atlanta, Georgia, examine the petitioner-defendant to determine, first, whether or not petitioner-defendant [1] is mentally incompetent; and [2] if so, then to determine whether or not there is probable cause to believe that petitioner-defendant was mentally incompetent at the time [a] of his arrests and [b] convictions, and [c] his jail escape; and upon completion of said examination submit a report of the results thereof to this Court."

9. Judge Clayton's extraordinary concern is further exemplified by the practice followed here of appointing a guardian ad litem (an attorney) plus an attorney representing the guardian and his petitioning ward.

4241,[10] 4244,[11] 4245.[12] Gregori v. United States, 5 Cir., 1957, 243 F.2d 48; United States v. Cannon, 2 Cir., 1962, 310 F.2d 841; see also Van de Bogart v. United States, 5 Cir., 1962, 305 F.2d 583. But this does not either prohibit or discourage use of this statutory machinery for psychiatric examination. This supplies to the District Judge a valuable tool to use in obtaining the evidential information necessary to rule properly on the issues raised by the § 2255 motion.

■ But as a tool, it must be properly turned. A literal tracking of the procedure outlined in these sections expressed in terms of or present mental competency would not do the job. Consequently, if this machinery was to be utilized, it was the function of the Judge through his order to focus the attention of the board of examiners on the critical medico-legal questions at issue to assure the gathering of the particular psychiatric data necessary to reach the professional opinions on which a court might determine the validity of Petitioner's complaint. Since there are many shades and phases of mental disorders as well as degrees of severity, and since the law—especially criminal law—attaches different consequences to the presence of a particular mental disorder in a defendant at different stages of the trial process,[13] the Judge's order [14] should indicate the distinctive medico-legal issues involved.[15]

10. See note 7, supra.

11. Using the same bracketed numbers as in note 8, supra, § 4244 quite understandably speaks in terms of present mental condition since this is the problem at hand:

"Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense * * * may [1] be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency * * *. Upon such a motion * * *, or upon its own motion, the court shall cause the accused, * * * to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed * * * to a suitable hospital or other facility to be designated by the court. [2] If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing * * * at which evidence * * * may be submitted, including that of the reporting psychiatrist, and making a finding with respect thereto. * * *."

12. "Whenever the Director of the Bureau of Prisons shall certify that a [prisoner] * * * has been examined by the board of examiners referred to in * * * Section 4241, and that there is probable cause to believe that such person was mentally incompetent at the time of his trial * * * the Attorney General shall transmit the report * * * and the certificate * * * to the clerk of the district court * * *. Whereupon the court shall hold a hearing to determine the mental competency of the accused in accordance with the provisions of section 4244. * * * If the court shall find that the accused was mentally incompetent at the time of his trial, the court shall vacate the judgment of conviction and grant a new trial."

13. Whereas "insanity" might be necessary for an acquittal, a lesser mental disorder might prevent a defendant from standing trial, and a still lesser degree might vitiate a waiver of counsel. See Winn v. United States, 1959, 106 App.D.C. 133, 270 F.2d 326. The reason why is obvious. The law asks different questions in each instance.

14. There is nothing novel in this. It is just a specific application of F.R.Civ.P. 35(a) which requires that an order for physical or mental examination "shall specify the time, place, manner, conditions and scope of the examination * * *." Cf. Schlagenhauf v. Holder, 1964, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152. Of course the important thing is that the Court-designated expert know what is at issue. We do not begin to suggest that the Judge's "order" meet the technical precision of a common law writ.

15. We decline to blueprint what, if any, legal definitions or standards need be expressed. Much must, and should, be left

We agree, therefore, with Appellant that the order was improper. If followed—and we can hardly assume conscientious doctors would ignore it—it conditioned determination of *past* mental capacity upon a finding of *present* incompetence. At best it gave the examiners ambiguous instructions. But our search does not end here, because if the record affords a safe assurance that Johnson was in fact examined about and, at the § 2255 hearing, the examining doctors adequately testified to his mental condition in 1961, then the inaccurate wording of the order would present no cause for relief here.

The record bears out Appellant's argument that true to the order, the examination in Atlanta was carried out to determine Johnson's present mental competency, and that the testimony concerning the examination to determine his mental condition in 1961 is wholly insufficient on which to base the expressed opinions. The trial Court, nevertheless, found that at the time of the arraignment Johnson had the requisite mental capacity to properly waive appointment of counsel and plead guilty.

The Court's finding was based on the testimony of the prison psychiatrist (Dr. Charles R. F. Beall) and the clinical psychologist at the prison (Laurence L. Bryan, Ph.D.). Dr. Beall examined Johnson on November 18, 1963 at which time he took a history from Johnson. The history recounted among other things an unhappy childhood, a meaningless outlook on life, that several members of his family had been hospitalized for mental disorders, that in 1949 he had been honorably discharged prematurely from the Air Force after psychiatric consultation as being unsuitable for continued service, that he had inflicted cuts upon himself and had taken an overdose of barbiturates in 1959. Dr. Beall made no independent inquiry into any of these things but on the basis of his observation "diagnosed him as [being in] a reactive depression, that is, depression as a result of the situation in which he found himself, namely, in prison with 23 years staring him in the face." His examination revealed no impairment of Johnson's ability to reason or respond intelligently.

The United States Attorney then asked Dr. Beall if based on his examination of Johnson and his listening to Johnson and other lay witnesses testify as to his background at the hearing, he could evaluate his "mental condition with respect to whether he was competent or not at the time of his being involved in those crimes and arraignment of August 4, 1961?" Dr. Beall answered that according to the history given, the 1963 interview was during one of his worst periods of depression and at that time he regarded him as competent, and if he had episodes of depression in 1961 which "were of the same nature and degree then I feel he was no more incompetent in '61 than he was when I saw him." But the "if" was a big if and Dr. Beall with candor made no effort to minimize his inescapable assumption "that [Johnson's] depression was of no severer nature at that time [1961] than at the time [I] saw him." Thus from Dr. Beall's testimony it is perfectly clear that in his mind the purpose of his examination was to determine Johnson's present actual condition. That he undertook, quite understandably, to answer the questions put to him in court and such statements pertaining to 1961 were reasonable deductions does not alter the situation that they were based on significant assumptions as to which the underlying factual or expert data were not sought out or explored in the examination.

The testimony of Dr. Bryan, the psychologist, was similar. He had admitted Johnson to the psychiatric ward in Atlanta for study under the Court's order. At that time he had a brief conversation with him. His testimony was based on

to the good sense of the Judge and that of the experts, too, most of whom are hardly novices unaware that to advance probatively persuasive opinions they must field a wide variety of questions from the lawyers. See, Stewart v. United States, 1957, 101 U.S.App.D.C. 51, 247 F.2d 42.

this brief interview, a study of the files, and discussion with Dr. Beall and Dr. Yokum. His diagnosis was

> "that he was an antisocial sociopath, with some emotional instability, some general resentment and hostility towards society, with some tendency toward depression at times, but not of psychotic proportions.

> "I concluded that he was sane in the legal sense or, speaking in the terms of our profession, without psychosis, and I found no evidence in my study of his case of his ever having been psychotic or insane or incompetent."

More specifically, he answered that he thought that he was sane and competent at the time of the arraignment in 1961. Cross examination, however, revealed that Dr. Bryan's opinion left several things unanswered about his condition in 1961. For example, presumably based on some filed affidavits of prisoners confined with him in 1961 describing incidents of Johnson hearing voices and acting strangely, the doctor was asked if "a history of having had audio-hallucinations in the past" would affect his opinion. To this, Dr. Bryan answered:

> "I'd have to know a lot about them before I could answer that question intelligently, and have to know the nature of them, and what went before them, and how long they lasted, and to what degree and extent they affected his behavior. * * *

> "It would have a bearing upon my opinion as to his mental condition at the time he experienced them; yes, sir."

He agreed with Dr. Beall that at the time they saw Johnson he was in a state of reactive depression. On this score, and as to how definitively they could clas-sify Johnson's 1961 condition based upon their limited inquiry, the following dialogue is indicative:

> "Q. It's not unusual, though, that a person would have episodes, different episodes, of depression, is it?

> "A. We see cases in which the condition is recurrent, but where the episodes recur they very often vary considerably from one to another in intensity, so that sometimes they are of psychotic proportions and sometimes they are not. * * *

> "Q. * * * If you examined a person when he was in a state of depression, you would not be able to tell the severity of a previous or a subsequent state of depression which he might have from an examination of him at that time, would you?

> "A. Probably not, unless it would come out in the interview with the patient. * * *"

Thus it is apparent that although the Court proceeding put Dr. Bryan in a position of expressing an opinion about Johnson's condition in 1961, it was an afterthought based on the limited inquiry into present competency and unavoidable assumptions not pursued in the examination as conducted.

The record leaves us then with an uncertainty as to what the experts' opinions would have been as to these divergent times and legal standards [16] had the inquiry into them and the underlying data been developed—not as a forensic matter in response to counsel's questions put in court—but in the course of the professional examination. The hearing therefore becomes inadequate, not because of any lapses in courtroom judicial fairness, but rather because the trust-

16. These may be tabulated as follows:

| Times | Mental Capacity To |
|---|---|
| (1) Date of Offenses | (a) Commit crimes |
| (2) Date of Arraignment | (a) Understand proceedings |
| | (b) Assist in defense |
| | (c) Waive counsel |
| | (d) Plead guilty. |

worthiness of the technical, professionally esoteric testimony was inescapably weakened by the restrictions on the out-of-court medical inquiry, which inquiry the Judge and the Government for good reason thought to be essential.

 The cause must therefore be remanded for further and consistent proceedings on this phase.[17]

## II.

### The Contempt Conviction

About a month after his own conviction, Johnson was called as a witness in another prosecution growing out of the same robberies in which he had been involved. Upon Johnson's refusal to answer a series of questions about the transaction, he was taken, along with counsel for both sides, into the Judge's chambers where he was directed to testify fully and truthfully. While in chambers one of the defense attorneys attempted to advise Johnson that he could refuse to answer on grounds of self incrimination. The Judge expressed doubt about Johnson's right to do so, but reserved ruling on it. The matter apparently ended there. After further discussion and direction by the Judge, Johnson was returned to the courtroom, where he consistently answered the United States Attorney's questions with "I don't remember" even to the point of "not remembering" having pleaded guilty a month earlier. Once again, Johnson was returned to chambers where the Judge warned him of the impending contempt proceedings and told him he would be given over the night to decide how good his memory was going to be. While in chambers and immediately after the Judge's warning to Johnson, one of the defense attorneys inquired of the Judge about Johnson having requested psychi-

atric aid. The Court summarily rejected this because Johnson was not his client.

The next morning in chambers Johnson asked if he could take the Fifth Amendment, to which the Court replied he could not because he had taken the stand voluntarily. Once more, the Court inquired about any reason why he should not testify, to which Johnson made this answer which wraps up the whole constitutional notion of right to counsel:

"Well, I don't know my rights. I am a little old country boy. I am not a lawyer. I don't know any rights in court.

"I don't have a defense; nobody to advise me. You asked me a question. I don't know how to answer it. I just refuse to answer any more questions."

The Judge then asked several specific questions pertaining to the case on trial, each of which Johnson refused to answer. The Judge then proceeded immediately to find that Johnson had "wilfully * * and contemptuously" refused to answer and that he was "guilty of contempt of court * * * committed in the presence * * * and * * * personal knowledge of the Judge of this Court," see F.R.Crim.P. 42(a). He thereupon sentenced him to five years, which was later changed to three years and made to run consecutive to the already imposed 15-year term.

 Petitioner sought to contest the validity of his contempt conviction by motion pursuant to § 2255. Under Heflin v. United States, 1959, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407, and the many cases following it, this cannot be done. Heflin established that § 2255 is available only to contest the validity of a sentence under which a petitioner is presently restrained. Here, Johnson has

17. Following the commendable procedure developed by Judge James N. Carter, Pre-Trial Suggestions for Section 2255 Cases, 1963, 32 F.R.D. 391; see Sanders v. United States, 1963, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148, the trial Court required Johnson to specify all

grounds on which relief under § 2255 was sought. Of course, this is a civil proceeding, Juelich v. United States, 5 Cir., 1963, 316 F.2d 726, and the further psychiatric testimony may be obtained by deposition.

not yet begun to serve time for his contempt conviction. However, this does not necessarily foreclose our consideration of the contempt conviction. We must disregard technical procedural formalities and may treat an inapposite § 2255 motion as one for correction of an illegal sentence under F.R.Crim.P. 35, Heflin v. United States, supra, or as one in the form of the ancient writ of error *coram nobis,* Young v. United States, 5 Cir., 1964, 337 F.2d 753, 756; Igo v. United States, 10 Cir., 1962, 303 F.2d 317, 318.

As to Rule 35,[18] although the Supreme Court in Heflin appeared to open the door to a reading of Rule 35 which would have allowed it to be used in a broad range of cases falling without the ambit of § 2255, the door was subsequently closed tight in Hill v. United States, 1962, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417. It was there stated:

> "But, as the Rule's language and history make clear, the narrow function of Rule 35 is to permit correction at any time of an illegal *sentence,* not to re-examine errors occurring at the trial or other proceedings prior to imposition of sentence." (Emphasis by the Supreme Court)

This seems to recognize a distinction between an illegal sentence and a sentence illegally imposed, see 4 Barron, Federal Practice & Procedure § 2302 (Wright ed. Supp. 1964), with all those cases falling in the latter being excluded from Rule 35 review.

The writ of error *coram nobis,* however, is available to Petitioner in this peculiar fact situation. In United States v. Morgan, 1954, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248, it was settled that the passage of § 2255 did not abolish the writ of *coram nobis,* and that under 28 U.S.C.A. § 1651—the "all writs" statute—the writ may be utilized "under circumstances compelling such action to achieve justice." Thus questions concerning the basic fairness of a conviction may be raised both before and after a sentence has been served. In Williams v. United States, 10 Cir., 1959, 267 F.2d 559, also a case where Petitioner had not yet begun to serve the challenged sentence, *coram nobis* was held available.[19] The thorough opinion of Judge Burger in Thomas v. United States, 1959, 106 U.S.App.D.C. 234, 271 F.2d 500, demonstrates the wide acceptance of the use of the writ of *coram nobis* to attack sentences before service under them. And this Court in Shelton v. United States, 5 Cir., 1957, 242 F.2d 101,[20] so held without the prescience perhaps accorded by Young v. United States, 5 Cir., 1964, 337 F.2d 753, of foreseeing in 1957 that the Supreme Court's 1963 decision in Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285, would transmute a non-2255 proceeding into a valid one. In any event we recognize *coram nobis* as "an extraordinary remedy" although its use "should be allowed only under circumstances compelling such action to achieve justice." Young v. United States, 337 F.2d at 756.

To the only question, whether the circumstances of this case are such that justice requires that the validity of the contempt conviction be considered here and now, the answer has to be yes.

> "Fair analogy leads to the conclusion that as a matter of law the judgment and sentence of seven years imposed upon the appellant could be challenged before its service had begun upon the grounds pleaded in the motion for writ of error coram nobis." 267 F.2d at 560.

18. F.R.Crim.P. 35, in pertinent part: "The court may correct an illegal sentence at any time. * * * "

19. There, while serving one sentence, the Petitioner was convicted of assaulting a prison officer and sentenced to a term of years to begin running subsequent to the term which he was then serving. He asserted that his plea of guilty was not voluntarily entered. Relying on the Morgan case, the Court stated:

20. See subsequent *en banc* decision, reversing on the merits, 246 F.2d 571, vacated and remanded, 356 U.S. 26, 79 S. Ct. 563, 2 L.Ed.2d 579.

One basis upon which Petitioner attacks the contempt conviction is that he lacked the requisite mental capacity to commit the offense, to stand trial, etc. This presents essentially the same issues as previously discussed in relation to the larceny offenses. Since the contempt occurred only one month after Johnson's own arraignment it manifestly would be bad judicial husbandry not to consider the pertinent common mental competency questions at the same time. To put off for ten or fifteen years consideration of Johnson's mental competency with regard to the contempt conviction until he begins serving that sentence will certainly frustrate, if not foreclose forever, any intelligent answer to these related questions which depend so much on evanescent psychiatric data and opinions. Another factor is the demonstrable nature of the denial of the fundamental right—here the rudimentary right to counsel. Therefore, we hold that review is available by way of the writ of error *coram nobis*, and that the District Court erred in not setting this conviction aside.

▮▮▮▮▮ Apart from mental competency matters, Petitioner also asserts that the summary imposition of a three-year sentence was improper because he was denied the assistance of counsel. We agree. While punishment for criminal contempt has historically been the province of the Court—its instrument to punish disruptive and contumacious behavior—United States v. Barnett, 1964, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23; Green v. United States, 1958, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672, it partakes so much of the nature of a criminal proceeding that comparable procedural safeguards must be accorded one charged with criminal contempt. See Panico v. United States, 1963, 375 U.S. 29, 84 S.Ct. 19, 11 L.Ed.2d 1; Cliett v. Hammonds, 5 Cir., 1962, 305 F.2d 565.

▮▮▮ The most minimal requirement of procedural due process is that an accused at a critical stage of a criminal proceeding must be assured the right to counsel. Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Hamilton v. State of Alabama, 1961, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114; White v. State of Maryland, 1963, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193; Massiah v. United States, 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

Here, at the very critical moment, Petitioner made known his desire to consult counsel. Indeed, the record reveals that counsel for a defendant was present and in the highest tradition of the bar proffered his assistance, which the Judge declined on the ground that the witness was not the attorney's client.

Counsel was certainly needed. Certainly was counsel needed for a defense. And we cannot foreclose the possibility that had Petitioner had an opportunity to consult with counsel, he might have chosen to purge himself of the contempt and testify. See Randazzo v. United States, 5 Cir., 1964, 339 F.2d 79.

▮▮▮ We therefore conclude that the Court's failure to afford Petitioner an opportunity to consult with a lawyer before going on with the summary contempt proceeding was a denial of due process of law, and accordingly this conviction and sentence must be vacated and the case remanded. We do not undertake to spell out what form the new hearing must take or before whom it must, or may, be held. With adequate counsel being assured the accused, the District Court will be fully informed by the respective advocates and will conduct the trial or hearing before an appropriate Judge or jury in conformity with law.[21]

Vacated and remanded.

---

21. The Court will undoubtedly assess the effect of the Supreme Court's caveat-dictum in footnote 12 of the Barnett case with regard to the imposition of a penalty as severe as three years imprisonment without a jury trial. United States v. Barnett, 1964, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23. See Randazzo v. United States, 5 Cir., 1964, 339 F.2d 79, 81. It may soon be answered by Harris v. United States, 2 Cir., 1964, 334 F.2d 460, cert. granted, 379 U.S. 944, 85 S.Ct. 438, 13 L.Ed.2d 542.