Robert V. BRUCE, Petitioner-
Appellant,

v.

W. J. ESTELLE, Director, Texas Department of Corrections, Respondent-
Appellee.

No. 72-2641.

United States Court of Appeals,
Fifth Circuit.

Sept. 6, 1973.

Michael Anthony Maness, court-appointed, Houston, Tex., for petitioner-appellant.

John L. Hill, Atty. Gen., Lonny Zwiener, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before WISDOM, GEWIN and COLEMAN, Circuit Judges.

GEWIN, Circuit Judge.

In this case, we are once again confronted with the difficult task of reviewing the question whether a state prisoner is entitled to a writ of habeas corpus because of his alleged incompetence to assert an intelligent and meaningful defense during his trial. The record discloses an unusual and bizarre factual background. We do not lightly undertake our responsibility because it was a fundamental precept at common law,[1] and more recently a constitutional mandate that one who is incompetent cannot be criminally prosecuted.[2]

Robert Bruce, a state prisoner appeals from the denial of his petition for the writ of habeas corpus by the district court. On November 2, 1965, Bruce was convicted of the murder of his wife and the jury imposed a sentence of life imprisonment. His conviction was affirmed on direct appeal.[3] His subsequent application for a writ of habeas corpus to the Texas Court of Criminal Appeals was denied without a hearing. Thereafter on December 6, 1966, he filed a petition for the writ of habeas corpus in the United States District Court for the Northern District of Texas which denied the writ. On appeal, we vacated and remanded the case with instructions to dismiss the writ without prejudice to Bruce so he could reapply for relief in

---

1. It was recognized early in our legal history that:

 If a man in his sound memory commits a capital offense, and before his arraignment he becomes absolutely mad, he ought not by law to be arraigned during such frenzy, but be remitted to prison until that incapacity be removed. The reason is, because he cannot advisedly plead to the indictment. . . . And if such person of nonsane memory after his plea, and before his trial, become of nonsane memory, he shall not be tried; or, if, after his trial, he becomes of nonsane memory, he shall not receive judgment, or, if after judgment he becomes of nonsane memory, his execution shall be spared; for were he of sound memory, he might allege somewhat in stay of judgment or execution.

 1 Hale, The History of the Pleas of the Crown, 34–35 (1736), *cited in* Youtsey v.

 United States, 97 F. 937, 940 (6th Cir. 1899) (opinion by Justice, then Circuit Judge Lurton). *See* United States v. Chisolm, 149 F. 284, 289–290 (C.C.S.D.Ala. 1906) where the court stated:

 [T]he humanity of the law is such that no man should be considered a proper subject for criminal prosecution, of whose ability to fairly and rationally make a defense there is just ground for reasonable doubt in the minds of the judge or jury which passes on that issue.

2. *See* Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L.Ed.2d 815 (1966); Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L. Ed. 835 (1956); Sanders v. Allen, 69 App. D.C. 307, 100 F.2d 717, 720 (1938).

3. Bruce v. State, 402 S.W.2d 919 (Tex.Cr. App.1966).

the state court in which he was convicted.[4]

Accordingly, Bruce sought relief from the state convicting court. The state court empaneled a jury and after a full hearing in which extensive testimony was presented, the jury returned a verdict that Bruce had been competent to stand trial in 1965 for the murder of his wife. Adopting the findings of the jury, the state court denied relief on September 26, 1969. On appeal the Texas Criminal Court of Appeals affirmed without opinion and Bruce instituted the instant petition in the United States District Court. The United States District Court concluded that the competency issue was fairly resolved by the state court and dismissed the petition. After a careful review of the state court record, we remand to the district court for further proceedings consistent with this opinion.

## I

In order to place this case in proper perspective it is necessary to set forth a detailed statement of the undisputed facts. As earlier indicated, the facts are bizarre, novel and most unusual. During the Christmas season, specifically on December 22, 1964, Bruce killed his wife, the mother of his three children, by shooting her with a pistol. After his arrest and while in the Dallas County Jail Bruce attempted to take his own life. It is now admitted that the record supports the conclusion that he was sane at the time of the homicide.

Shortly thereafter, on January 12, 1965, a grand jury was convened to investigate the case. Private counsel was retained and Bruce was examined by two psychiatrists, Dr. Pickard and Dr.

Holbrook. On February 26 they pronounced him insane and classified his mental disease as "Paranoid Personality Disorder, Severe, Chronic."[5] On March 1, 1965 the grand jury no-billed the case and Bruce was held for a lunacy commitment. Two days later, the Probate Court of Dallas County concluded that Bruce was insane and "ordered, adjudged and decreed that (Bruce) is hereby adjudged mentally ill and requires observation and/or treatment in a mental hospital for his own welfare and protection or the protection of others," and ordered him involuntarily committed to Terrell State Hospital, an institution for the treatment of the mentally ill. There is nothing in the record to indicate that this determination has ever been set aside.

Soon after his admission, Bruce, aided by counsel, obtained a release from the hospital by "Doctor" *Reid* Brown, alias Freddie Brant, who was subsequently determined to be an imposter and was convicted of perjury and practicing medicine without a recorded license. He was given a sentence of five years under the perjury charge. On May 6, 1965 Bruce voluntarily committed himself to Terrell State Hospital but later escaped. The authorities were advised that he was no longer confined to the hospital and on May 24 a grand jury indicted him for the murder of his wife.

Counsel who had served Bruce to this point, Mr. McNicholas, was dismissed apparently because he insisted that Bruce should enter a plea of insanity in defense of the charge against him. Another attorney, Mr. Snodgrass, was employed with the apparent understanding that both the father and Bruce would not permit an insanity plea because it

---

4. Bruce v. Beto, 396 F.2d 212 (5th Cir. 1968). Our vacation and remand of the case was based on the conclusion that after Bruce had exhausted all his state remedies, Texas had enacted a new post-conviction relief procedure which provided for a full hearing on contested issues of fact. *See* Art. 11.07, Vernon's Ann.Texas Code of Criminal Procedure. *See* Figari, Competen-cy to Stand Trial in Texas, 25 Sw.L.J. 279 (1971).

5. Both doctors concluded that Bruce "is likely, because of his mental illness, to cause injury to himself or others if not immediately restrained." Dr. Holbrook stated that Bruce needed "long term psychiatric hospitalization."

was felt that such a plea "would reflect on his children." [6] He was convicted of murder with malice on September 21, 1965 and on October 28 of that year sentenced to life imprisonment.

At the state court post-conviction hearing to determine whether Bruce was competent to stand trial several witnesses appeared. Attorney Snodgrass who represented Bruce at his murder trial strongly indicated that he was instructed not to use the defense of insanity. Although Mr. Snodgrass "believed" that Bruce was able to communicate with him and assist in his defense, he did state that on two different occasions during the trial Bruce became emotional and erratic and for a short period each time Mr. Snodgrass felt that he was not competent to assist him. There was some testimony that on these occasions the trial judge threatened to bind and gag Bruce if he persisted in emotional outbursts. The state supported its contention of competency with the testimony of only one other witness, Dr. Grigson. Dr. Grigson testified that he interviewed Bruce for one hour in the Dallas County Jail on February 4, 1969 and concluded from that interview and an examination of records that Bruce was competent to stand trial in September, 1965.[7]

Dr. Hugh Brown (not to be confused with Reid Brown), a physician and former superintendent at Terrell State Hospital, interviewed Bruce on two different occasions in April and September 1969. He also had access to the hospital records which he studied and analyzed. It was his professional opinion that Bruce was not competent at the time of his murder trial.[8] Dr. Tauber, another physician employed at Terrell State Hospital, examined Bruce physically and neurologically over a period of six weeks beginning in February 1969. He saw Bruce daily during that period. Dr. Talbot, a consulting psychologist at Terrell State Hospital, administered five psychological tests to Bruce. Dr. Tauber conferred with Dr. Talbot and also examined the records and the treatment administered to Bruce while he was a patient at the hospital. It was Dr. Tauber's conclusion that Bruce was not mentally competent to stand trial in September 1965 when the trial was conducted.[9] Attorney McNicholas expressed the opinion that Bruce was un-

---

6. Even though Bruce's father was instrumental in preventing the assertion of an insanity defense, he had been principally responsible for having Bruce committed to Terrell after his arrest.

7. During the one hour interview Dr. Grigson gave Bruce a mental status examination. Dr. Grigson stated that during the interview Bruce displayed no abnormal mannerisms, talked logically, and responded intelligently to questions. During the interview Bruce told Dr. Grigson that he often talked to his deceased wife. Dr. Grigson concluded however that Bruce was "faking" since he did not react to his professed hallucination or evince any of the side effects associated with hallucinations.

On cross-examination however Dr. Grigson admitted that his discussion with Bruce concerning the events and circumstances surrounding the 1965 trial lasted only a few moments. Other than Bruce's conduct during the one hour interview, Dr. Grigson gave no specific underlying reasons for his opinion that Bruce was "sane" during the 1965 trial.

8. Dr. Brown based his opinion in part on the following factors:
(a) Bruce's long history of mental difficulties including his medical discharge from the Marine Corps.
(b) The traumatic events surrounding the homicide of his wife.
(c) Bruce's difficulty in recalling any events following his arrest in 1965.
(d) His attempted suicide while in jail following his original arrest for his wife's murder.
(e) The medication given to Bruce during his commitment to Terrell in 1965.

9. In his written report to the state court Dr. Tauber stated:
In my professional opinion gained during many psychiatric evaluations, I believe that he was sane at the time of the offense (murder on December 22, 1964). Under Sodium Amytal on 3–14–69 he described the incident as an accident and he feels extremely guilty as well as sorry about this occurrence. I also gained the opinion that he was very emotional and unstable during the trial in September

able to effectively communicate with him and was incompetent to assist in a criminal proceeding during the time he served as Bruce's attorney. Bruce's father described a long history of aberrational behavior commencing in early childhood and continuing throughout his adult life.

The medical records of the Marine Corps reflect that Bruce experienced rather severe emotional trouble while he served as an enlisted man. At one time while he was drinking he seized a rifle and commandeered the barracks where a number of marines were quartered. He was finally subdued by six other marines and the record indicates that it required six fellow marines to transport him to the hospital.[10]

After presentation of all the evidence, the jury returned a verdict concluding

that Bruce was competent to stand trial in 1965. The state court adopted the findings of the jury and denied relief. The district court reviewed the record of the state court proceedings and concluded that Bruce had been given a full and fair hearing on the issue of insanity, and the evidence adduced at the state proceeding supported the conclusion that Bruce had been sane and fully capable of standing trial in 1965. We now review the correctness of these conclusions.

## II

██ Our analysis commences with the elementary observation that the conviction of an accused while he is legally incompetent violates due process.[11] The contours of this fundamental right were delineated by the Supreme Court in Dus-

---

1965. It appears that he had difficulty in following the jury trial and I am of the opinion that he was not capable in assisting his own defence [sic] sufficiently. There is a very strong possibility that the emotional stress triggered by the killing of his wife and his incarceration, together with the rejection he received from his children and his wife's family, together with the excitement of the trial, activated his already present mental illness then (schizophrenia) to become more pronounced disabling him at that time. Therefore, I would assume that he suffered from symptoms of his illness and that he was insane at the time of the trial. During the Sodium Amytal interview on 3–14–69 and during all psychiatric examination[s] he had pronounced difficulties in describing the trial, and he always talked about emotional outbursts in a courtroom and admitted some crying and being confused.

10. Entries in Bruce's medical history contained in his military discharge are particularly revealing on the traumatic events surrounding his early years:
1. Patient quit school in the 3rd year [of] high school at the age of 19 because he was expelled because of arguments with a male teacher. His grades were poor and he failed one time. He had very little interest in school.
2. His judgment and insight are nil. His intelligence is dull normal.
3. The patient went to some firends house on the evening of 12–11–51 and be-

gan drinking cocktails. He states he had about 3 or 4 and returned to the barracks and does not remember anything after he left the friends house. The story is as follows: The patient went to the barracks and became very hostile and assaultive and with the aid of his M–1 rifle took complete charge and command of the Marine Barracks for the short space of about 20 minutes, until he was subdued by about 6 Marines. He was taken to the main dispensary where he again became very obscene, combative, assaultive and pugnacious requiring 6 Marines to bring him to the hospital. . . .
4. On 2–8–52 patient began drinking and on 2–9–52 drank some more and became extremely assaultive, obscene, destructive and belligerent requiring about 60 grams of sodium amytal within 12 hours. On 2–11–52 he had spontaneous recovery. A careful consideration of this case by the entire staff of this hospital has caused us to conclude that this was an extreme psychopathic episode in a life long behavior problem.

11. Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956). "The trial and conviction of a person mentally and physically incapable of making a defense violates certain immutable principles of justice which inhere in the very idea of a free government." Sanders v. Allen, 69 App.D.C. 307, 100 F.2d 717, 720 (1938).

ky v. United States,[12] where the Court held that the test for determining mental competency to stand trial is:

> whether he [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.[13]

As is often the case, however, the legal principle is explicated with an ease not present when procedures are attempted to effectuate the right thus recognized. This problem is further accentuated when one attempts to present a competency challenge long after the trial as in the instant case.

■■■ This court has attempted to provide a meaningful procedure for determining competency to stand trial in a subsequent post-conviction hearing. We have recognized that such defenses should normally be presented at the trial itself.[14] Nonetheless, the Supreme Court has held that,

> [I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently "waive" his right to have the court determine his capacity to stand trial.[15]

Thus any attempt to argue that an incompetent defendant has waived his right to assert incompetency to stand trial in a post-conviction proceeding will generally fail. If a defendant can present sufficient objective evidence following his trial which necessitates a hearing to determine whether he was competent at trial, it follows naturally that he has presented enough evidence to overcome any waiver argument presented by the government.[16]

■■■ We have previously enunciated the proper procedure for a district court in this circuit to follow when an incarcerated felon attempts by a writ of habeas corpus to prove that he was incompetent at the time of trial as follows:

> . . . when a prisoner, either state or federal, seeking post-conviction relief, asserts, with substantial facts to back up his allegation, that at the time of trial he was not mentally competent to stand trial, and that there was no resolution of that precise issue before he was tried, convicted and sentenced, the protection of the Fourteenth Amendment to the Constitution requires that such conviction and sentence be set aside *unless upon adequate hearing it is shown that he was*

---

12. 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *see also* Swinney v. United States, 422 F.2d 1257 (5th Cir. 1970); Blake v. United States, 407 F.2d 908, 910 (5th Cir. 1969) (en banc).

13. 362 U.S. at 402, 80 S.Ct. at 788.

14. Clark v. Beto, 359 F.2d 554, 557 (5th Cir. 1966).

15. Pate v. Robinson, 383 U.S. 375, 384, 86 S.Ct. 836, 841, 15 L.Ed.2d 815 (1966). "This constitutional right cannot be waived by the incompetent—by guilty plea or otherwise—and thus it must be protected by adequate state procedures." Carroll v. Beto, 421 F.2d 1065, 1067 (5th Cir. 1970). *See also* Floyd v. United States, 365 F.2d 368, 377 (5th Cir. 1966); Johnson v. United States, 344 F.2d 401, 405 (5th Cir. 1965); Taylor v. United States, 282 F.2d 16, 22–23 (8th Cir. 1960); Nelms v. United States, 318 F.2d 150, 152–153 (4th Cir. 1963); Smith v. United States, 267 F.2d 210, 212 (9th Cir. 1959).

16. A petitioner is not automatically entitled to a hearing on his mental incompetency. He must set forth sufficient facts in his petition from which the court can properly determine that there is a need for such a hearing. *See* Meadows v. United States, 282 F.2d 942 (5th Cir. 1960) (alleged prior mental illness); Praylow v. United States, 298 F.2d 792 (5th Cir. 1962) (sentencing court recommended a psychiatric treatment at the time of sentencing); Van de Bogart v. United States, 305 F.2d 583, 588 (5th Cir. 1962) (psychiatric report following post judgment examination suggested mental illness); Callahan v. United States, 297 F.2d 79 (5th Cir. 1961) (prior escape from a mental institution); Alexander v. United States, 290 F.2d 252 (5th Cir. 1961) (under influence of narcotics during trial). Although these cases involve federal prisoners the same burdens should prevail when a state prisoner seeks federal habeas corpus in the circumstances disclosed by the record in the instant case.

*mentally competent to stand trial.*[17] . . . it will be the duty of the trial court . . . to decide whether it can conduct an adequate hearing on the question of [the prisoner's] competency to stand trial . . . . If it cannot, it will be under the obligation to set aside the judgment of conviction and remand the case to the state courts for a new trial at which time it will, of course, be open to [the prisoner] to have an adequate hearing on his then mental capacity to stand trial.[18]

In sum, the district court must determine whether a meaningful hearing can be conducted at all. If this threshold issue can be answered in the affirmative, then a hearing should ensue at which time both sides can present evidence on the ultimate issue of competency to stand trial.

### III

We feel that only two issues raised by petitioner need be resolved for a proper disposition of this case. First, on the basis of the record before us, can it be concluded that a meaningful determination nunc pro tunc of Bruce's competency to stand trial may be accorded him? Second, assuming that such a hearing could be conducted, does the record of the state proceedings support the conclusion that Bruce was afforded such a meaningful hearing? It is our considered opinion that even though a meaningful hearing might have been conducted to determine Bruce's prior competency to stand trial, the events and circumstances surrounding the state hearing were of such a nature that the meaningfulness of that proceeding was completely vitiated. We are thus compelled to remand to the district court for a full, fair and hopefully final hearing on peti-

tioner's competency to stand trial for the murder of his wife in 1965.

Since the district court fully approved the critical facts found in the state proceedings we are essentially reviewing the state court's determinations.[19] In Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Supreme Court articulated the standards to be applied by a federal district court in deciding whether a de novo hearing should be granted to state habeas corpus petitioners. The Court held that a new hearing must be granted if "for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." [20] Thus, it is the duty of a federal court to initially review the state court proceedings for the purpose of resolving whether they were conducted in a manner to fairly adduce the facts surrounding a petitioner's claims.[21]

Under the unusual facts and circumstances disclosed by the record of the state court proceedings we cannot escape the conclusion that the district court erred in this regard. We limit our decision to such facts and circumstances. Since the lower court in effect adopted the findings of the state habeas proceeding, it implicitly held that the procedures there employed were consistent with a fair and full ascertainment of the facts. Our review of the state proceeding leads us to the opposite conclusion. There are several reasons for our conclusion that the state proceeding did not meet the requisite standard of a full and meaningful hearing. Although each surrounding factor might not be sufficient when viewed in isolation, when the state record is scrutinized as a whole, the inherent prejudicial impact of the state proceeding is given full significance.

---

17. Lee v. Alabama, 386 F.2d 97, 105 (5th Cir. 1967) (en banc) (emphasis added).

18. *Id.* at 108.

19. Carroll v. Beto, 421 F.2d 1065, 1066 (5th Cir. 1970).

20. 372 U.S. at 313, 83 S.Ct. at 757.

21. *See* 28 U.S.C. § 2254(d) (1970); O'Neal v. Smith, 413 F.2d 269, 270 (5th Cir. 1969).

## A. *Confusion of the Issues*

Bruce was given a hearing before the state court on September 24, 1969. The court empaneled a jury to determine the contested issues of fact. In this proceeding, however, the jury was required to resolve three controverted factual issues: first, Bruce's criminal responsibility for the murder of his wife in 1964; second, his mental competency to stand trial in 1965; third, his mental competency during the pending hearing. Thus the jury's assignment was not an easy one considering the fact that it had to resolve conflicting lay and expert testimony on three distinct mental faculties of Bruce both in time and circumstance.

 Moreover, the state court record reveals that these distinct issues were not kept separate and were often intermixed which must have resulted in confusion in the minds of the jurors. Both criminal responsibility and mental competency to stand trial involve issues of one's perception of his surrounding environment, his ability to relate to that environment, and his reactions to what is perceived. The cases and authorities have repeatedly noted that when questioning lay or expert witnesses concerning an individual's mental competency to stand trial, the questioner should be exact in his examination in order that the proper light may be shed on the crucial factors which compose an intelligent competency determination.[22]

 Any resolution of a factual controversy requires evidence and testimony which is both material and relevant to the contested issues. When dealing with a competency issue the trier of fact needs evidence on a petitioner's "present ability to consult with his lawyer with a reasonable degree of rational understanding" and on "whether he has a rational as well as factual understanding of the proceedings against him."[23] At the state proceeding, the interrogation was so ambivalent and equivocal on the issue of competency, that any determination of Bruce's competency was meaningless.[24]

## B. *Prejudicial Comments*

Conflicting expert and lay testimony was presented at the state hearing. Drs. Hugh Brown and Tauber concluded that Bruce was "insane" at the time of his state trial, while Dr. Grigson concluded that he was "sane." Attorney McNicholas felt that Bruce was "insane" and attempted to assert such a defense for his former client while Attorney Snodgrass was convinced that Bruce had been "sane." The only evidence to the contrary was the testimony of Attorney Snodgrass, who served under limiting instructions from Bruce's father and the opinion of Dr. Grigson who spent only one hour with Bruce while in jail.

In view of the nature of the evidence, a serious factor which accentuated the potential for unfairness was the highly inflammatory and prejudicial comments of the state counsel's closing arguments to the jury. In rhetoric reminiscent of

---

22. *See* Lee v. Wiman, 280 F.2d 257, 265 (5th Cir. 1960); Johnson v. United States, 344 F.2d 401, 406 n. 13 (5th Cir. 1965); Floyd v. United States, 365 F.2d 368, 376, n. 9 (5th Cir. 1966); Mims v. United States, 375 F.2d 135, 142 (5th Cir. 1967); Lee v. Alabama, 406 F.2d 466, 471–472 (5th Cir. 1969) (en banc); Featherston v. Mitchell, 418 F.2d 582, 584 (5th Cir. 1969); Floyd v. United States, 427 F.2d 63, 65 (5th Cir. 1970). *See also* United States v. Taylor, 437 F.2d 371, 375–376 (4th Cir. 1971); Holt v. United States, 329 F.2d 368, 372 (7th Cir. 1964); Feguer v. United States, 302 F.2d 214, 236 (8th Cir. 1962); Noble v. Sigler, 351 F.2d 673, 676–677 (8th Cir.

1965); Wolcott v. United States, 407 F.2d 1149, 1151 (10th Cir. 1969); Arnold v. United States, 432 F.2d 871, 874 (10th Cir. 1970); Oliver, Remarks, Panel on Recognizing and Determining Mental Competency to Stand Trial—Insanity as a Defense, 37 F. R.D. 155, 158–160 (1964); Matthews, Mental Disability and the Criminal Law, 83–87 (1970).

23. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

24. This was one of the deciding factors in the Supreme Court's reversal in Dusky v. United States, 362 U.S. 402, 403, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

**1040**

a television drama state counsel warned the jury that:

> I suggest right now he's [Bruce] thinking, he knows that they have already said he was sane in '64 already said sane now, you find him insane at the time of his trial, *he goes free.* That's what he knows, because you can't incarcerate in a mental hospital a sane man. *I think he knows that he can't be tried again.* I think he knows the memories have faded and the evidence has dissipated in the intervening four years.
>
> That's what I think he knows. It's a very clever attempt to put something over on you as jurors to where he gets out of prison after having done life, [sic] been given a life sentence in Dallas County for the crime of murder with malice.
>
> This is your county. You can do what you want to. You're the arbiters of what goes on in this county. *If you want him walking the streets of your county, you go ahead and let him out; find him insane at the time of his trial and you will have effectively let him out of prison.* That's what you are facing in your decision in this trial. [Emphasis added]

Such emotional, erroneous and prejudicial comments have no place in a dispassionate resolution of the question wheth-

er Bruce was competent in 1965 to stand trial.

These comments most probably infected the whole decision-making process of the jury. State counsel knew that Bruce could be retried and his assertion to the jury that he could not was erroneous. Such irrelevant diatribes cannot be countenanced.[25]

■ We are mindful of the fact that federal courts do not sit as courts of errors and appeals when a state prisoner seeks federal habeas corpus.[26] At the same time, we cannot ignore our responsibility to insure that an accused obtains a fair trial by an impartial jury. As the Supreme Court has reiterated time and again, "[e]xercise of calm and informed judgment by . . . [a jury's] members is essential to proper enforcement of law."[27] Highly prejudicial remarks uttered by the prosecutor jeopardize the jury's deliberative processes and hence infringe upon an accused's right to a fair hearing on the merits of the case.[28]

### C. Improper Standard

■ Finally, and perhaps most important of all, there is another reason why this case must be remanded to the United States District Court for an appropriate hearing. The jury instructions given by the state habeas court at

---

**25.** "Constitutional protections are not reserved for good people and denied to bad, nor does competence to stand trial go by the board because the crime charged is serious." Tyler v. Beto, 391 F.2d 993, 1003 (5th Cir. 1968) (Godbold, J. dissenting). *See also* McDonald v. Wainwright, 466 F.2d 1136 (5th Cir. 1972); Hall v. United States, 419 F.2d 582 (5th Cir. 1969); United States v. D'anna, 450 F.2d 1201, 1206 (2d Cir. 1971); United States v. Jenkins, 140 U.S.App.D.C. 392, 436 F.2d 140, 145 (1970). Chief Judge Bazelon has noted that:

> When the defense of insanity has been properly invoked, the law requires proof beyond a reasonable doubt that the accused was sane at the time of the offense charged. It will not countenance an appeal to a jury for a conviction upon the ground that, even if he was insane, he is

the type of person who may be dangerous. . . . [N]othing justifies a judge in warning a jury that, if they acquit the accused, they will be releasing a dangerous man to prey upon society.

Blunt v. United States, 100 U.S.App.D.C. 266, 244 F.2d 355, 367 (1957). Although the posture of the present case is not the same as that existing in *Blunt*, these observations are equally applicable to the prejudicial conduct at Bruce's state hearing.

**26.** *See* Burgett v. Texas, 389 U.S. 109, 120, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967) (Harlan, J. dissenting).

**27.** Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965) *citing* Sinclair v. United States, 279 U.S. 749, 765, 49 S.Ct. 471, 73 L.Ed. 938 (1929).

**28.** *Cf.* Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

the state post-conviction hearing were brief, and although somewhat ambiguous, seem to indicate that the M'Naghten rule was the controlling standard to determine competency to stand trial.[29] It is not necessary for us to reach the question whether the State of Texas should or should not use the M'Naghten rule to determine criminal responsibility at the time of the alleged crime. Apparently such was the Texas rule at the time of the post-conviction hearing in September 1969. However, we are firm in the conclusion that the M'Naghten rule cannot be used as a standard to determine competency to stand trial. Again we emphasize that the appropriate standard required by the federal constitution is set forth with simple clarity in Dusky v. United States, *supra:*

> . . . whether he [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.

362 U.S. at 402, 80 S.Ct. at 789.

---

29. The instructions given by the court are set forth in full below:

> The defendant, Robert Vernon Bruce, is presently incarcerated under a life sentence, having been convicted of the felony criminal offense of murder with malice aforethought. The issue of his sanity is properly before this Court upon a Writ of Habeas Corpus.
>
> You are instructed that every person is presumed to be sane, that is, of sound memory and discretion until the contrary is shown by proof, and the burden of proof, as to insanity, is upon the defendant to prove his insanity, if any, by a preponderance of the evidence, that is, by the greater weight of the credible testimony.
>
> You are further instructed that under the law no person can be tried for a criminal offense while in a state of insanity.
>
> This is a trial upon the issue of present insanity.
>
> You are charged that in law, a person is deemed to be insane when such person is laboring under such defect of reason as not to know the nature and quality of the act or acts he was doing, or if he did know the nature and quality of his act or acts, he did not know he was doing wrong, that is, that he did not know the difference between the right and the wrong as to the particular act or acts he was doing. The mind must be so dethroned of reason as to deprive him at the time of a knowledge of the right and the wrong as to his act or acts, and deprive him of the power to choose between right or wrong as to his act or acts.
>
> In this connection you are further instructed that in law a person is deemed to be presently insane if he is in such mental condition so that he does not know the nature of the charges against him, and the consequences thereof, and that he is mentally unable to comprehend the proceedings taking place, and mentally unable to consult and advise with his attorney and with others with that degree of understanding as to render him mentally competent to make a rational defense, if any he has, to the charges against him.
>
> On the issue of present insanity of the defendant, you are instructed that the law requires a jury to find and state in its verdict whether the defendant is sane or insane at the time of this trial, and if the jury finds the defendant to be presently insane, then, the jury shall find and state in its verdict whether the defendant requires hospitalization in a mental hospital for his own welfare and protection or the protection of others.
>
> If the jury finds the defendant to be presently insane, then you shall find and state in your verdict whether the defendant requires hospitalization in a mental hospital for his own welfare and protection or the protection of others.
>
> Now, bearing in mind the foregoing instruction, it is your duty to find and state in your verdict whether this defendant is sane or insane at this time, the time of this trial, to-wit: September 24, 1969, and whether the defendant does or does not require hospitalization in a mental hospital for his own welfare and protection or the protection of others.

After giving the foregoing instructions which defined the issue as "a trial upon the issue of present insanity" the court, nevertheless, submitted 3 forms of verdicts, one dealing with the sanity of petitioner at the time of the habeas hearing on September 24, 1969, a second dealing with his sanity at the time of the trial on September 21, 1965, and a third addressing his sanity at the time of the alleged murder on December 22, 1964.

The instructions set forth above were not presented to the United States District Court. They were furnished to the Clerk of this court upon request through the courtesy of the Attorney General of Texas.

Our conclusion is buttressed by obvious doubts and ambiguities with respect to the legal significance to be accorded the testimony submitted on behalf of the state in this case.

 The *Dusky* standard emanates from and is given vitality by the due process clause of the fifth amendment. Thus, like many other constitutional protections, the standards utilized for a determination of whether these numerous guarantees have been accorded must be national in application. The standards for judging competency to stand trial fall into the same category as those constitutional principles which govern jury composition, voter participation, freedom of speech and other federally protected rights.[30]

Here, the state record is replete with examples of the use of the M'Naghten standard as a basis for judging Bruce's competency to stand trial. The M'Naghten rule has no relevance to an intelligent resolution of the competency issue at the time of trial, regardless of the particular standard employed by a state. Whether one knows the difference between "right and wrong" during his trial is unrelated to the crucial factors which compose the *Dusky* standard.

 Thus we conclude that the hearing afforded Bruce by the state, considering the record as a whole, was fundamentally unfair. The circumstances surrounding the hearing, the confusion of the crucial issue, the prejudicial and inflammatory comments by state counsel and the use of an improper standard in determining his competency prevented a fair possibility of a detached and intelligent ascertainment of the question whether Bruce had been competent to stand trial. Considering the animus which a murder conviction instills in the average citizen, a jury's resolution of allegations like those presented by Bruce must be protected from the introduction of explosive collateral facts and arguments. The record reveals however that the state completely failed to fulfill its responsibility in this regard.

## IV

 Because we feel that the state hearing was fundamentally unfair and thus was conducted in a manner which would not fully and fairly resolve the issue of petitioner's competency to stand trial, we remand to the district court for further proceedings. Bruce now asserts that no meaningful determination can be made retrospectively of his mental competence to stand trial in 1965. Initially, we note that this is properly a threshold question for the court to determine on remand. However, based on the record which now exists we certainly see no obstacles to such a retrospective determination.

While it is true that almost eight years have elapsed since Bruce's trial, the passage of time is only one of the factors to be considered.[31] Here there is abundant expert testimony and at the time of trial Bruce had been recently ob-

30. The Eighth Circuit aptly stated and correctly responded to the issue presented here:

> State courts . . . apply different and varying standards to determine a defendant's fitness to proceed. When the Federal court is called upon by a habeas corpus petition to assess the mental condition of a state prisoner at the time of his trial, should the court apply the standard that was, or would have been, used by the state trial court, or should it apply the test applicable in Federal criminal cases?
>
> The answer appears to us to be that the Federal standard for competency must be applied even though the original proceeding was before a state court. Since this is a Federally recognized right, its determination must be by Federal standards. It should not be subject to the varying and perhaps lesser standards established by state law. It must be above dilution and equally applicable as a minimum guarantee to citizens of all states.

Noble v. Sigler, 351 F.2d 673, 677 (8th Cir. 1965).

31. *See, e. g.*, Carroll v. Beto, 330 F.Supp. 71 (N.D.Tex.) aff'd, 446 F.2d 648 (5th Cir. 1971) (determination made 22 years after trial).

served by the staff at Terrell. Thus while not foreclosing further inquiry into this initial question on remand, we think the evidence tends to support the conclusion that a meaningful hearing can now be conducted.[32]

If on remand the court should determine that a meaningful hearing can be conducted, then further proceedings must be held on the competency issue. If however the court should conclude that such a hearing cannot be conducted, then the petition should be granted subject of course to the right of the state to re-try petitioner within a reasonable time.

### V

■ We consider it appropriate to add a caveat with respect to cases of this type. Courts in habeas corpus proceedings should not consider claims of mental incompetence to stand trial where the facts are not sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with counsel during a criminal trial. While the factual pattern will vary from case to case, the instant case illustrates the standard which should be met to sustain such a claim, *viz.* a history of mental illness, substantial evidence of mental incompetence at or near the time of trial supported by the opinions of qualified physicians and the testimony of laymen. The burden is on the petitioner to prove his allegations; such proof should be clear and convincing.

It is truly unfortunate that this case has not finally and definitively been re-

solved. Bruce has now been actively pursuing his post-conviction remedies for seven years. His case has now been reviewed by over seventeen state and federal judges. However, the Constitution guarantees procedures which have substance, not merely form, to insure the vindication of our citizens' fundamental liberties. We would thus be remiss in our duty if we turned a deaf ear to petitioner's contentions since the record in this case evidences proceedings which did not adequately permit him to fairly present his serious allegations. Accordingly, this case is reversed and remanded for proceedings consistent with this opinion.

Reversed and remanded with directions.

COLEMAN, Circuit Judge (concurring):

I concur in the decision that Bruce must be given a meaningful hearing in the District Court. I do this solely because, as described in the opinion prepared by Judge Gewin, the State Court hearing failed to meet the necessary standards of adequacy.

I cannot understand why an "advisory jury" was asked its opinion on the sole issue involved in the post-conviction collateral attack. In such cases as this, findings of fact and conclusions of law are the responsibility of Judges, *not juries*.

There is much else that I might say about this case but, hopefully, the hearing to be held in the District Court will have extirpated the necessity for such remarks.

32. *See* McGarrity v. Beto, 335 F.Supp. 1186, 1194 (S.D.Tex.) aff'd, 452 F.2d 1206 (5th Cir. 1971); Sensabaugh v. Beto, 343 F. Supp. 563 (N.D.Tex.1972); Sharp v. Beto, 276 F.Supp. 871 (N.D.Tex.1967).